**J. B. BEAN et al.**
v.
**UNITED STATES.**
No. 71–57.

United States Court of Claims.
July 16, 1958.

W. Morgan Hunter, Austin, Tex., Theodore Andress, El Paso, Tex., Thurman Arnold, Arnold, Fortas & Porter, Washington, D. C., Andress, Lipscomb & Peticolas & Fisk, El Paso, Tex., and Powell, Rauhut, McGinnis & Reavley, Austin, Tex., on the briefs, for plaintiffs.

Alfred H. O. Boudreau, Jr., and David R. Warner, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., Walter Kiechel, Jr., Washington, D. C., on the briefs, for defendant.

WHITAKER, Judge.

Plaintiffs sue for the taking by defendant of rights they claim in the waters of the Rio Grande River. Their properties lie in the Hudspeth County Conservation and Reclamation District No. 1 (hereinafter called Hudspeth District). This district adjoins the El Paso District to the north, which El Paso District is a part of defendant's Rio Grande irrigation project.

The case comes before us on defendant's motion for summary judgment on the limited question as to whether or not the plaintiffs have any water rights with respect to the waters of the Rio Grande River which have been taken by the defendant, acting through the Bureau of Reclamation of the Department of Interior. No dispute as to any material fact appears. Both parties have submitted exhibits for and against defendant's motion.

The decision of the case turns on what rights, if any, were acquired by plaintiffs under notices of appropriation of the waters of the Rio Grande filed by the Bureau of Reclamation in 1906 and 1908, and the subsequent delivery of water to plaintiffs by defendant and its beneficial use by plaintiffs.

The notices of appropriation were issued pursuant to the Act of February 25, 1905 (33 Stat. 814). By this Act Congress amended the Reclamation Act of 1902 so as to include within its terms a portion of the State of Texas bordering on the Rio Grande. The Act provided:

"That the provisions of the reclamation Act approved June seventeenth, nineteen hundred and two, shall be extended for the purposes of this Act to the portion of the State of Texas bordering upon the Rio Grande which can be irrigated from a dam to be constructed near Engle, in the Territory of New Mexico, on the Rio Grande, to store the flood waters of that river, and if there shall be ascertained to be sufficient land in New Mexico and in Texas which can be supplied with the stored water at a cost which shall render the project feasible and return to the reclamation fund the cost of the enterprise, then the Secretary of the Interior may proceed with the work of constructing a dam on the

Rio Grande as part of the general system of irrigation, should all other conditions as regards feasibility be found satisfactory."

Following the passage of this Act, the United States, acting through the Reclamation Bureau, in 1906 filed with the Territorial Irrigation Engineer of New Mexico a notice of intention to appropriate 730,000 acre-feet of the water of the Rio Grande. This was pursuant to section 22 of Chapter 102 of the 1905 Acts of the 36th Legislative Assembly of the Territory of New Mexico, authorizing the United States to appropriate such waters. The notice appears in a footnote [1] below.

Later, in April 1908, the Bureau of Reclamation filed a further notice, notifying the Territorial Engineer that it intended to utilize "all the unappropriated water of the Rio Grande and its tributaries." In all material respects this notice is similar to the 1906 notice set forth in footnote 1 of this opinion. (Exhibit 3 to defendant's brief.)

Plaintiffs do not attack these notices, nor deny that they gave to the United States the right to appropriate the waters and to distribute them to lands in the Rio Grande project; plaintiffs' primary claim is that their lands were within the geographical area of the project authorized by the Act of 1905, and, therefore, that they acquired a vested right to the waters they began to receive from the project on December 1, 1924, despite the terms of the contract under which the water was delivered to them. Hence, they say, the defendant took their property, that is, their water rights, in 1951, when it cut off their supply of water.

[1]. Footnote follows:

"Water Appropriations, Rio Grande Project

Department of the Interior
United States Geological Survey
Reclamation Service

Carlsbad, New Mexico, Jan. 23, 1906.

"Mr. David L. White,
Territorial Irrigation Engineer,
Santa Fe, New Mexico.

"Dear Sir:

"The United States Reclamation Service, acting under authority of an act of Congress known as the Reclamation Act, approved June 17, 1902, (32 Stat. 388), proposes to construct within the Territory of New Mexico certain irrigation works in connection with the so-called Rio Grande project. The operation of the works in question contemplates the diversion of water from the Rio Grande River.

"Section 22 of Chapter 102 of the laws enacted in 1905 by the 36th Legislative Assembly of the Territory of New Mexico—an act entitled, 'An Act Creating the Office of Territorial Irrigation Engineer, to Promote Irrigation Development and Conserve the Waters of New Mexico for the Irrigation of Lands and for other Purposes,' approved March 16, 1905—reads as follows:

" 'Whenever the proper officers of the United States, authorized by law to construct irrigation works, shall notify the territorial irrigation engineer that the United States intends to utilize certain specified waters, the waters so described, and unappropriated at the date of such notice, shall not be subject to further appropriations under the laws of New Mexico, and no adverse claims to the use of such waters, initiated subsequent to the date of such notice, shall be recognized under the laws of the territory, except as to such amount of the water described in such notice as may be formally re-leased in writing by an officer of the United States thereunto duly authorized.'

"In pursuance of the above statute of the Territory you are hereby notified that the United States intends to utilize the following described waters, to wit:

"A volume of water equivalent to 730,-000 acre-feet per year requiring a maximum diversion or storage of 2,000 000 miner's inches said water to be diverted or stored from the Rio Grande River at a point described as follows:

"Storage dam about 9 miles west of Engle, New Mexico, with capacity for 2,-000,000 acre-feet, and diversion dams below in Palomas, Rincon, Mesilla and El Paso Valleys in New Mexico and Texas.

"It is, therefore, requested that the waters above described be withheld from further appropriation and that the rights and interests of the United States in the Premises be otherwise protected as contemplated by the statute above cited.

"Very truly yours,

"B. M. Hall,
*Supervising Engineer.*"

For this plaintiffs say they are entitled to just compensation under the Fifth Amendment.

Defendant says plaintiffs' lands were not a part of the project, that it was within the discretion of the Secretary of the Interior to determine what lands were to be included in the project, that, in the exercise of this discretion, he did not include plaintiffs' lands, and, therefore, that the waters delivered to them were delivered, not pursuant to the notices of appropriation of 1906 and 1908 filed by the Bureau of Reclamation, but pursuant to the contracts of December 1, 1924, and April 27, 1951, entered into under the Warren Act of February 21, 1911 (36 Stat. 925), 43 U.S.C.A. §§ 523–525, and that these contracts gave plaintiffs no vested rights to the use of the water.

It, of course, was within the discretion of the Secretary of the Interior to determine what lands were to be included within the project. The Act of 1905 makes this clear. Indeed, plaintiffs' brief admits this. On pages 21 and 22 they say:

"* * * In 1906 and 1908 and indeed, in 1924, the Reclamation Bureau had absolutely no obligation to deliver one drop of water through the Project irrigation works to the Hudspeth District. The Reclamation Bureau, as the initiator of the appropriation and the owner of the irrigation works, had the perfect right to select the specific lands to which it would deliver water for beneficial use. As late as 1924, the Reclamation Bureau had the perfect right to retain in storage or to dump back into the river every drop of water that could not be beneficially used on the tracts of land which the Reclamation Bureau selected to benefit. And had the Reclamation Bureau elected to deliver no water to the Hudspeth District, the Hudspeth landowners could never have acquired appropriative water rights under the Reclamation Notice of priority date 1906."

The Secretary did not make the Hudspeth lands a part of the project, as will clearly appear hereinafter.

The mere fact that plaintiffs' land might have been in the geographical area of the irrigation works authorized by the Act of 1905, *supra*, is of no moment. They can not benefit by the appropriation notices of 1906 and 1908 unless the Secretary of the Interior made their lands a part of the project for which the waters were appropriated, because, as we have said, he had the right to determine what lands were to be included within the project. In our opinion plaintiffs' case stands or falls depending upon whether or not their lands were a part of the Rio Grande project, because if they were not, plaintiffs' rights are to be determined by the Warren Act and by the above-mentioned contracts, and it is clear under them that defendant had the right to cut off plaintiffs' supply of water, if it was needed on project lands. It is admitted that it was needed.

The Warren Act provided in part:

"Whenever in carrying out the provisions of the reclamation law, storage or carrying capacity has been or may be provided in excess of the requirements of the lands to be irrigated under any project, the Secretary of the Interior, preserving a first right to lands and entrymen under the project, is hereby authorized, upon such terms as he may determine to be just and equitable, to contract for the impounding, storage, and carriage of water to an extent not exceeding such excess capacity with irrigation systems operating under the Act of August eighteenth, eighteen hundred and ninety-four, known as the Carey Act, and individuals, corporations, associations, and irrigation districts organized for or engaged in furnishing or in distributing water for irrigation. * * *"

From this it is clear that the Secretary was authorized to contract to deliver to nonproject lands only such water as is in excess of the needs from time

to time of the project lands. He was authorized to contract to deliver this excess only with the understanding that the lands in the project should have the "first right" to the water. This means that if the project lands ever needed this water, they should have the "first right" to it, even though the Secretary may have contracted to deliver it to others.

The contract entered into on December 1, 1924, between the Hudspeth District and the Reclamation Bureau follows the Warren Act and makes clear that the rights of the landowners in the District are inferior to those in the project, and that when the project lands need the water, they are entitled to it, and landowners in the District cannot complain when it is given to them. Sections 6 and 13 of the contract of December 1, 1924, provide:

"6. The United States will deliver to the District at the terminus of the Tornillo Main canal, during the irrigation season of 1925 and thereafter during each irrigation season as established on the Rio Grande project, such water from the project as may be available at said terminus without the use of storage from Elephant Butte reservoir. The Secretary of the Interior shall be at all times the sole judge of the availability of such water. The rental of water hereunder is secondary and inferior to the right to use water for any purpose on the lands of the Rio Grande Federal irrigation project. In consideration of such rental the District hereby relinquishes all right, title, interest, and claim to any and all waters of the Rio Grande, except as herein provided.

\* \* \* \* \* \*

"Shortage in Water supply

"13. On account of drouth, inaccuracy in distribution or by reason of the requirements and use on the lands within the Rio Grande Federal Irrigation Project or by the use of

municipalities supplied by the waters thereof, or other causes, there may be at times an insufficiency of water for District lands but in no event shall any liability accrue against the United States or any of its officers, agents or employees for any damage, direct or indirect, arising therefrom, nor shall any charge provided for herein be reduced on account of any such shortage."

The contract of December 1, 1924, was amended on April 27, 1951, primarily to obviate the necessity of having to enter into supplementary contracts each year to fix the rental to be paid, but sections 6 and 13 of the 1924 contract were somewhat amended. As amended, they read:

"6. The United States has delivered to the district during the irrigation season of 1950, and will deliver thereafter during each irrigation season, such water as may be available through the following distribution facilities or others which may be constructed and useful in the future: The Tornillo Canal; The Fabens Waste Channel; the Outlet of the Tornillo Drain. So far as it may do so without additional project expense to the United States, it will endeavor to make waters available hereunder, to the end that the district may fully utilize such waters for the irrigation of its lands. The availability, the choice of distribution facilities and the points of availability will be dependent upon operating conditions on the project, without the use of project storage. The Secretary of the Interior shall be at all times the sole judge of the availability of such water. The rental of water hereunder is secondary and inferior to the right to use of waters on the Rio Grande Federal Irrigation Project for any purposes. The district hereby relinquishes to the United States all right, title, interest and

claim to any and all waters of the Rio Grande vested in the District as of December 1, 1924, except as herein provided.

"13. On account of drouth, inaccuracy in distribution, or by reason of the requirements and use within the Rio Grande Irrigation Project or by reason of use of project water transferred from project water right lands, for municipal purposes, or other causes, there may be at times an insufficiency of water for district lands but in no event shall any liability accrue against the United States or any of its officers, agents or employees, for any damage direct or indirect arising therefrom, nor shall any charge provided for herein be reduced on account of any such shortage except as provided in Article 7 hereof. * * *"

If these contracts determine plaintiffs' rights, it is plain that defendant has deprived them of nothing that they were entitled to, because it is not disputed that during the severe drought in Texas this water was needed on project lands. When the drought was broken, we understand deliveries of water to District lands were resumed.

We come back, then, to the question of whether or not the Hudspeth District lands were a part of the Rio Grande Project. We do not think they were.

In the first place, plaintiffs practically concede they were not in paragraph 1.5 of their petition. This reads:

"The Rio Grande Project is a reclamation project of defendant and embraces Elephant Butte Dam and Reservoir and a great network of irrigation ditches and other works between Elephant Butte Dam and the El Paso-Hudspeth County line. All the irrigation works within Elephant Butte and El Paso Districts are operated by the Bureau of Reclamation as a part of the Rio Grande Project; those two districts having similar contracts with defendant with respect to operation and maintenance of such works. El Paso District and Elephant Butte District are sometimes herein referred to jointly at the 'Project Districts,' the lands within those two districts as 'Project lands,' and the owners thereof as 'Project landowners.'"

In the second place, the contract between the Hudspeth District and the United States of December 1, 1924, in paragraph 2 recites: "Whereas the District contains an irrigable area of 20,014 acres, located in Texas, *just below the Rio Grande Federal Irrigation Project.*" (Italics ours.) This is a direct statement that the District lands are not a part of the project, to which plaintiffs assented. Also paragraphs 6 and 13 of the contract recognize that the District lands are outside the project. In section 6 it is recited: "The rental of water hereunder is secondary and inferior to the right to use water for any purpose on the lands of the Rio Grande Federal Irrigation Project." Then in section 13 it is recited: "On account of drought, inaccuracy in distribution or by reason of the requirements and use on the lands within the Rio Grande Federal Irrigation Project or by the use of municipalities supplied by the waters thereof, or other causes, there may be at times an insufficiency of water for district lands * * *."

Thus, in three places the Hudspeth District recognizes that the lands in it are not a part of the project lands.

Thirdly, contracts under the Reclamation Act of 1902, covering project lands, were entered into with the Elephant Butte Irrigation District of New Mexico, covering lands in New Mexico, and with the El Paso County Water Improvement District, covering lands in El Paso County, Texas, and these are the only two contracts entered into according to the terms of the Reclamation Act of 1902, covering lands within the project.

Each of these contracts calls for assessments and levies against the landowners in the districts in order to repay to the United States the cost of the project, as required by the Reclamation Act of 1902, and by the Act of February 25, 1905, supra, and by the Reclamation Project Act of 1939 (53 Stat. 1193), as amended (59 Stat. 75), 43 U.S.C.A. § 485 et seq. Each district assumed responsibility for the payment of a specified part thereof, determined according to the number of irrigable and cultivatable acres in each district.[2]

The Reclamation Act of 1902 (32 Stat. 388) provides for the creation of a reclamation fund, and for the construction of irrigation projects, where in the judgment of the Secretary of the Interior such a project is practicable. In section 4 the Secretary is required to give notice of the lands to be irrigated and of the charges to be made per acre for the benefits to be received from the project, and it is then provided: "The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably * * *." Section 6 provides for the transfer of the management and operation of the irrigation works to the owners of the lands irrigated, when the required charges have been paid on the major portion of the lands irrigated.

This particular project was authorized on the condition that "there shall be ascertained to be sufficient land in New Mexico and in Texas which can be supplied with the stored water at a cost which shall render the project feasible and return to the reclamation fund the cost of the enterprise * * *." Act of February 25, 1905, supra.

The above mentioned contracts with the Elephant Butte and El Paso Districts provided for assessments against the lands in the project in amounts estimated to be sufficient to return to the reclamation fund the cost of the project, and otherwise complied with the provisions of the above Acts. No such contract was entered into with the Hudspeth District. It did not assume liability for any part of the cost of the project, nor could the landowners in the District ever participate in the management and operation of the irrigation works. It agreed to pay a stipulated rental for the water to be furnished it, and this was the extent of its liability.

For these reasons we hold that the lands in the Hudspeth District were not a part of the Rio Grande Project, and that the landowners in the District acquired no rights under the notices of appropriation of 1906 and 1908 filed by the Reclamation Bureau.

The view we take is in accord with that of the Fifth Circuit Court of Appeals, in Hudspeth County Conservation and Reclamation District No. 1 v. Robbins, 213 F.2d 425, 431, note 6.[3]

From this it follows that plaintiffs' rights are governed by the contracts entered into between defendant and the Hudspeth District, unless plaintiffs' next position is correct.

2. Plaintiffs' next position is that, while the December 1, 1924, contract covered unused waters from the Rio Grande project, it did not apply to the seepage and drainage waters received from the El Paso District, and that plaintiffs acquired appropriative rights to these waters, which were taken by defendant in 1951. These were waters once used to irrigate lands in the El Paso District, but which, after such use, seeped through the land and into drainage ditches within the El Paso District.

2. The contracts with these two districts are too long to be set out in this opinion. They appear as exhibits 4 and 5 to the defendant's brief.

3. While plaintiffs' efforts in that case, and Miller v. Jennings, 5 Cir., 243 F.2d 157, to secure injunctive relief against the officials of the Bureau of Reclamation failed on jurisdictional grounds, the Court of Appeals in the Robbins case, supra, did state that it was its conclusion that plaintiff's lands were not, nor were they intended, to be covered by the 1906 and 1908 notices.

Plaintiffs say that for several years these waters, after use on lands in the El Paso District, were dumped into the bed of the Rio Grande River, and that they diverted them from the river and used them beneficially on their lands. This, plaintiffs say, gave them certain rights to these waters, which has been taken by defendant.

Later, plaintiffs say, defendant connected these drainage ditches with the irrigation system of the Hudspeth District and have delivered these waters directly to the Hudspeth District.

█ It might be said, in passing, that a beneficial use of waters alone gives the user no vested right to them. Preceding the beneficial use there must have been a filing of a notice of intent to appropriate. The filing of a notice of intent is not shown. The permit #236 granted the predecessor of the Hudspeth District in 1917, and assigned to the Hudspeth District, is of no avail to plaintiffs because of non use. But we do not rest our decision on this ground, but rather on the more basic ground which we now state.

█ There can be no doubt under the authorities that the Reclamation Bureau, under its appropriations of 1906 and 1908, had the control and the right to prescribe the use of the seepage from lands within the project, as well as the original use of the waters. Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 68 L. Ed. 407; State of Nebraska v. State of Wyoming, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815. Nor does the fact that for several years these seepage waters were dumped into the river bed show an abandonment of the defendant's rights to seepage waters in the future. It merely showed that at the time defendant had no need for the waters; it did not show it abandoned its right to control the use of them, when it did have need of them · in the future. If there was no abandonment by defendant, its rights, as a prior appropriator, are superior to plaintiffs' rights.

█ As to the waters actually dumped into the river bed, of course defendant did abandon them, but that it did not thereby abandon its right to use these waters when needed in the future is shown by its resumption of control over them and the use of them on project lands and the later delivery of some of them to plaintiffs under contract. Furthermore, by the execution of this contract plaintiffs recognized that defendant had not abandoned its right to these waters and recognized its superior right to them.

Nor are plaintiffs correct in saying that the Warren Act contract of December 1, 1924, related only to unused waters, and not to seepage waters. Under that contract defendant agreed to deliver water to the Hudspeth District at the terminus of the Tornillo Main Canal. It is not said whether these waters were unused waters or seepage waters.

Then on April 27, 1951, the parties entered into an "amendatory contract," which in paragraph 2 recited:

"*Whereas*, the United States and the District entered into a contract on December 1, 1924, in pursuance of the Federal Reclamation Laws, hereinafter referred to as the contract of 1924, by the terms of which the United States rented to the District a portion of the *return flow, drainage and operational waste from the Rio Grande Project* for a fixed rental for the year 1925 and for a rental, thereafter determined annually; * * *" [Italics ours.]

Thus plaintiffs recognize that the contract of December 1, 1924, did cover "return flow, drainage and operational waste" waters, or seepage.

The next two succeeding sections of the 1951 contracts recite events that affected the availability of water from the project for the use of the District, and then section 7 provides:

"*Whereas*, Project return flow, drainage and operational waste is available for district use, at the

terminus of the Tornillo Main Canal of the project, or in the Fabens Waste Channel at the diversion point of Hudspeth Feeder No. 1, and from the Tornillo Drain outlet. * * * "

Thus return-flow or seepage waters are expressly covered in the 1951 contract.

From all the foregoing we cannot escape the conclusion that all of plaintiffs' rights are governed by the contracts of December 1, 1924, and April 27, 1951, and by them only. Under those contracts it is clear that defendant had the right to shut off the water from plaintiffs' lands, if it was needed on the lands of the project. This was done beginning some time in 1951, and was continued through the 1956 irrigation season.

3. Plaintiffs' claim of a taking of the riparian rights of some of the plaintiffs cannot be considered, because it is clearly barred by the statute of limitations. When in 1908 defendant appropriated *all* the water of the Rio Grande above plaintiffs' lands, their riparian rights were then destroyed. Their right of action, if any, then accrued.

The same is true of plaintiffs' claim that their rights were interfered with by the use by defendant of some of the water of the Rio Grande for the generation of electric power. The statute of limitations has long since barred any claim they may have had on this account.

But, independent of the statute, plaintiffs cannot complain of the diversion for the generation of electric power, unless plaintiffs first show they had a right to the waters by appropriation, and we have shown they do not have.

Defendant's motion for summary judgment is granted, and plaintiffs' petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.