**ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY**

v.

**UNITED STATES.**

No. 90–54.

United States Court of Claims.

June 8, 1960.

Peyton Ford, Washington, D. C., for plaintiff. R. S. Outlaw and Thomas Barnett, Chicago, Ill., and Ford, Larson, Greene & Horan, Washington, D. C., were on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

MADDEN, Judge.

The plaintiff railroad sues the United States for just compensation for the alleged impairment of its right-of-way resulting from the construction of a dam in the Rio Grande River and the creation of a large reservoir by the impounding of the water of the river.

The line of railroad here involved runs from Albuquerque, New Mexico to El Paso, Texas, a distance of 254.1 miles. It was built in 1880 and acquired by the plaintiff in 1899. It roughly follows the course of the Rio Grande River which flows south through Albuquerque and El Paso. About 100 miles south of Albuquerque the railroad descends into the river valley at a point near the former town of San Marcial, New Mexico, and runs diagonally across the valley and the river, crossing the river on Bridge 1006–A. Prior to 1920 it crossed at Bridge 1005–A which was then located about a half-mile north of the present 1006–A. After crossing the bridge, the railroad climbs out of the valley.

By statutory authority granted in 1905, the United States constructed a dam at Elephant Butte, New Mexico, which is approximately 42 miles south of Bridge 1006–A. The Government acquired land and flowage rights extending from the site of the dam to a point just north of Bridge 1006–A, as to other owners of land in the valley, but did not acquire any flowage rights from the plaintiff.

The spillway elevation of the dam was only two feet lower than the level of the stream bed at Bridge 1006–A in 1915 when the dam first began to impound water. In 1924 the head of the reservoir came to within 4.6 miles of the plaintiff's bridge. In May and June of 1942, though the level of water in the reservoir was much higher than in 1924, the head of the reservoir was 5.2 miles downstream from the bridge. This was because the stream bed downstream from the bridge was aggraded, i. e. built up with sediment, by 1942. The plaintiff says that the Government's reservoir was and is the cause of the rise in the level of the stream bed which will make the plaintiff's location in the valley untenable unless it spends some $5,000,000 to raise its bridge and approaches. Rather than making this expenditure it will, for some $3,-000,000, move its track out of the valley of the river. Its suit is for the lesser sum, and for some $700,000 which it spent because of a special situation in 1949.

The plaintiff's past and prospective difficulties are caused by the aggradation, by deposits of silt, of the bed of the river in the area of its bridge and approaches. When flowing water, laden with sediment, collides with still water, or water flowing with less velocity, the sediment is dropped and the channel is aggraded. The plaintiff says that that process, caused by the Government's reservoir, is responsible for the aggradation of the stream bed of the Rio Grande in the plaintiff's area.

The Government says that if any of the aggradation has been caused by the reservoir, it is only a small and unmeasurable part of the total aggradation. We have found that from the beginning of its operation the plaintiff has been engaged in a constant struggle to maintain its tracks, embankments, dikes and bridges against the effect of floods and sedimentation in the valley of the Rio Grande. Our finding 25 recites the history of this struggle. These events extended from 1881 to 1949, and the plaintiff does not claim that any of its expenditures, prior to 1949, were attributable to the reservoir.

The Rio Grande rises in the mountains of Colorado, where the melting snows and other precipitation amount to some 40 inches per annum. It is a clear stream until several tributaries in New Mexico, which tributaries flow through soil which is easily eroded, deposit great quantities of sediment at their mouths. These deposits, or deltas, are usually made during the summer floods in New Mexico, when the Rio Grande itself is carrying very little water. During the next spring runoff the Rio Grande scours these deltas away and carries the sediment down stream. In some of the tributary streams, the amount and rate of erosion have greatly increased during the time for which there are records. Erosion has also been increased because of the moval of vegetation from the uplands of the tributaries by overgrazing.

About the year 1930 a new plant appeared along the Rio Grande, the salt cedar or tamarisk. It thrives along the banks of the stream and on the deltas. Its branches begin close to the ground and it has a thick root structure. It entangles rubbish and slows down the flow of the water causing it to drop its sediment. Its growth has substantially affected the course and habits of the river.

In a state of nature the Rio Grande had a valley, in the area of the plaintiff's installations, of some 3,500 feet, and it shifted its channel from time to time, as the existing channel filled up with sediment so that a flood would break through the banks to the lower land outside the banks. The plaintiff's dikes and embankments directed the flow of the water through its bridge. As the river spread out below the bridge its velocity decreased and it dropped its sediment and aggraded the channel.

The parties are agreed that, if the Government's dam and reservoir had not been built, there would have been aggradation of the bed of the river at an average rate of 0.27 of a foot per year. If this average rate had been maintained from 1895 to 1954, the elevation of the

riverbed in 1954 at the plaintiff's bridge would have been 4,464.6 feet. The actual elevation was 2½ feet more than that. The average stated above has little relation to what happened in any particular year. For example, between April 1937 and October 1941, there was a degredation of seven feet, because of a breakthrough of a bank; thereafter there was unusually heavy aggradation to 1949, then degradation to 1954.

The level of water in the reservoir fluctuates greatly from time to time. In consequence the location of the head of the reservoir, the place where the flowing water meets the still water, and tends to drop its sediment, fluctuates by many miles. If the delta at one time is formed up the stream, closer to the plaintiff's bridge, and later the water in the reservoir is low, the flow of the water will tend to erode the former delta and carry the sediment down to the current head of the reservoir.

The Government has, since 1940, undertaken what are known as Middle Rio Grande Valley flood control and rehabilitation projects. A dam on the Rio Jemez, one of the lesser tributaries of the Rio Grande, is in operation. It will detain approximately 12 percent of the total sediment previously entering the Rio Grande from its tributaries. Other dams in the project will have a similar effect on a small scale. They will also, to some extent, even out the flow of water in the Rio Grande, and thus tend to prevent floods which cause aggradation.

From the above recital it is evident that there are numerous factors which have a part in producing the aggradation and degradation of the bed of the Rio Grande. It is a highly capricious stream, and it would be guesswork for us to attempt to determine how it will act in the future, or even the reasons why it has acted as it has acted in the past. When the plaintiff located its railroad in the valley of this river, it subjected itself to hazards and expenses which it has had to bear, almost from its first day in the valley. The plaintiff has not proved that the Government's dam and reservoir have increased or will increase those hazards and expenses by any amount even approximately measurable.

The plaintiff's action is premature. It may happen that in the future a condition may develop in which it is possible to determine, with reasonable certainty, that the defendant's reservoir has produced an ascertainable harmful effect upon the plaintiff's property. Our instant judgment is not intended to operate as a bar to a future suit based upon such a condition.

The plaintiff's petition will be dismissed without prejudice.

It is so ordered.

JONES, Chief Judge, LITTLETON, Judge (Retired), and LARAMORE and WHITAKER, Judges concur.