Per Curiam :
This case was referred pursuant to Rule 45 to C. Murray Bernhardt, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed August 17, 1962. The plaintiffs have failed to file a notice in writing of intention to except to the commissioner’s findings or recommendation pursuant to Rule 46(a) and upon defendant’s motion to adopt the commissioner’s report, filed on September 13, 1962, and the third party defendant’s motion to adopt commissioner’s report, filed October 12, 1962, the case was submitted without oral argument. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore not entitled to recover and their petition is dismissed. Further, the Government’s third party petition against the Atchison, Topeka and Santa Fe Railway Company is dismissed.
OPINION OP COMMISSIONER
The plaintiffs allege in their petition that they are the owners of land on which was located prior to 1954 a large clear-water lake where they operated for profit a resort for fishing, boating and wild fowl hunting. They claim that in 1954 the Government turned into the lake the heavily silted waters of the adjacent Rio Grande, increasing the silt level of the lake so radically as to kill the fish, prohibit boating, and discourage wild fowl hunting, thus destroying plaintiffs’ livelihood by depriving their property of its utility, all without just compensation. The plaintiffs did not allege affirmatively that they owned the lake or its waters, but at trial asserted a claim to ownership of that part of the lake which lay over their land. The plaintiffs owned or leased only part of the shoreline and most of the land under the lake, the *359 proportions thereof being irrelevant at the moment for reasons which will appear.
The defendant denies that its water conservation project which diverted part of the flow of the Rio Grande into the plaintiffs’ lake was more than a contribution to the silting up of the lake, and blames this primarily on the Atchison, Topeka and Santa Fe Railway Company which, in 1950, cut an opening in its railway embankment bordering the lake through which silt from the river and drainage ditches entered and accumulated in the lake. The Railway is im-pleaded as a third party defendant, and its efforts to be dismissed were unsuccessful. See opinion on motion in this case, 151 Ct. Cl. 587, 283 F. 2d 874. Other defenses are relied on by the defendant, but this discussion will be restricted to the plaintiffs’ failure to prove an appropriation of the water in the lake in accordance with the water laws of the state of New Mexico, for it is dispositive of the action independent of other grounds. The separately reported facts will also be confined to those relating to this dispositive defense, although the record itself on which the respective requests for findings are based covers other issues and facts besides those reported.
Article XVI, § 2 of the New Mexico Constitution, relating to appropriation of water, provides that the unappropriated water of every natural stream within the state is “declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right.” This constitutional provision has been interpreted to be declaratory of prior existing law, and the term “beneficial use” to which public waters may be placed has been held to include fishing and recreation. State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P. 2d 421.
The laws of the state of New Mexico relating to appropriation of water require that one intending to acquire the right to beneficial use of any water shall, before commencing any construction for such purpose, make application to the State Engineer for a permit to appropriate in the form required by rules and regulations. New Mexico Statutes, 1953, *360 § 75-5-1; Bean, et al. v. United States, 143 Ct. Cl. 363, 374. The statutory manner of acquiring rights to public water is exclusive. State of New Mexico v. King, 63 N.M. 425, 321 P. 2d 200. 56 Am. Jur. 743 states that “In one view the right of appropriation [i.e., of water] is a franchise, like that of digging gold, and is founded on a presumption of a general grant from the sovereign and a license from the state.”, citing Conger v. Weaver, 6 Cal. 548, 65 Am. Dec. 528. The plaintiffs have failed to put hi evidence any testimony or documents to show an appropriation in accordance with the water laws of the State of New Mexico, and a constructive appropriation by conduct would seem to be precluded. The defendant stressed in its requested findings the failure of the plaintiffs to advance facts supporting an appropriation, but the plaintiffs have not since suggested that such facts exist nor have they offered to produce them by a reopening of the evidence. It is fair to assume that the plaintiffs made no formal appropriation of the waters as the state law requires.
Instead, in order to show that the New Mexico statutes are inapplicable, the plaintiffs contend that the waters of the lake were not public waters but were their private property, and thus were not subject to appropriation under the water laws of the state. This contention rests on the evidence offered by plaintiffs that the waters of the lake originated from three springs rising on their property. Finding 8, infra, reaches a different conclusion. If there were springs— and the evidence as to their existence is inconclusive — the amount of water flowing from them is not known or susceptible to measurement. Instead, it is concluded that at all times the prime source of water in the lake was seepage from the river through the railroad embankment separating it from the Rio Grande, augmented occasionally by river overflows, arroyo runoffs, and some seepage at the north end of the lake from a pool of water formed by a drainage ditch leading down the valley from marshy areas further north. Of some persuasion to this end is the known fact that in the long period prior to the 1929 flood the town of San Marcial installed a drainage system to carry off what was referred to as seepage, an origin presumptively meaning percolation through the protecting dikes from the river rather than from *361 springs, it is thought, for the testimony of the coplaintiff was that water from the latter, if they existed at all, merely sunk into the ground. If the seepage from the river during that extended pre-1929 history had not been drained off by artificial means, we might assume that San Marcial would have pooled over into a lake long before without the intervention of the 1929 flood and its attendant avulsion in that area. Although no precedent has been discovered precisely to this effect, an understanding of the importance attributed to water in arid regions would fully support in logic that doubts as to the specific origin of waters in a lake, i.e., whether predominately public or private in nature, should be resolved in favor of the former so that the general public should share this vital asset rather than its use being restricted to the individual.
The plaintiffs further contend that even the seepage water from the Rio Grande rising on their land was their property and that once water ran from the Rio Grande into the lake, such water became the plaintiffs’ property, citing Vanderwork v. Hewes, 15 N.M. 439, 110 P. 567, and State of New Mexico v. King, 63 N.M. 425, 321 P. 2d 200.
In January 1906 and April 1908 the United States filed notices of intent to utilize all of the unappropriated water of the Rio- Grande for operation of the Elephant Butte Project which had been authorized by Congress. These appropriations of water rights necessarily included the right to incidental seepage. Ide v. United States, 263 U.S. 497, 505, 506. The river water which seeped into the subsequently formed lake did not thereby lose its identity as the property of the United States. The fact that for several years the river overflow and seepage waters were permitted to remain in the lake area does not constitute an abandonment by the United States of its rights to it, but merely represents a temporary inability to use the water so diverted until Congress authorized a conservation project aimed, inter alia, at recapturing the water by eliminating the diversion.
The Vanderwork case, supra, does not disturb this result. There the waters originated from a spring or seepage of unknown origin on plaintiffs’ land, unlike the present instance where the seepage forming the lake is traceable to the Rio *362 Grande, a public stream. State of New Mexico v. King, 63 N.M. 425, 321 P. 2d 200, stands for the proposition that where water in a privately owned lake formed from the flow of an irrigation canal percolates downward to an underground storage basin, at the latter point it becomes public water subject to appropriation for beneficial use in accordance with state law. King was enjoined from taking water from the underground basin for irrigation purposes by use of a well which he had drilled without a permit or license issued by the State Engineer. There was no issue in that case as to ownership of the surface lake, so reliance on the case for that purpose by the plaintiffs herein is not well placed.
In view of the foregoing it must be concluded that the plaintiffs were not the owners of a compensable property right and the action of the United States, therefore, did not constitute a taking. Accordingly, the plaintiffs’ petition and the Government’s third party petition against the Kailway should be dismissed.
FINDINGS OF FACT
1. In 1916 the United States completed the construction of the Elephant Butte Dam across the Kio Grande in New Mexico. In connection therewith the United States filed notices of intent to use the waters of the Kio Grande and its tributaries thus impounded.
2. Until 1929' San Marcial, New Mexico, was a township in the valley of the Kio Grande. In 1929 a large flood occurred in the area and San Marcial was completely inundated and destroyed. It was embedded in silt as high as the second stories of its buildings. The silt was never removed and the town was abandoned. The area remained swampy for several years after the flood and gradually became a clear-water lake, remaining so until 1954 when, in the course of constructing a water conservation project, the United States channeled the flow of the Kio Grande through the lake in order to silt it up, and succeeded. The technical aspects of the project and the purpose and effect of another project by the third party defendant, Atchison, Topeka and Santa Fe Railway Company, in 1950 involving the cutting *363 and bridging of its railway embankment bordering tbe eastern shore of tbe lake are fully presented in tbe record but are omitted bere because they do not relate to tbe dispositive issue wbicb bas been selected for separate consideration. That issue concerns tbe plaintiffs’ claim to ownership of tbe waters in tbe lake, which, in turn, requires a finding as to their origin.
3. In 1945 and 1946 tbe plaintiffs, husband and wife, acquired ownership of a number of lots and several tracts of land in and adjacent to tbe former town of San Marcial. They also leased still more land in that area on several occasions from 1946 through 1956. They thus controlled by ownership or lease a substantial proportion of tbe land covered by tbe lake, and part of its shoreline. At tbe lake they operated for profit a resort for fishing, boating and wild fowl hunting. Tbe deliberate silting up of tbe lake by tbe Government in 1954 made tbe lake unusable for tbe plaintiffs’ purposes. Consideration of what percentage of tbe lake bottom and its shoreline the plaintiffs owned or leased, and of tbe effect of certain assignments and grants between tbe parties is not relevant to tbe separated issue relating to ownership of tbe waters of tbe lake, and so will not be the subject of these limited findings.
4. Tbe plaintiffs offered no evidence that they bad ever appropriated tbe waters of the lake in accordance with the water laws of the State of New Mexico, and there is no such evidence in tbe record.
5. There is a sharp dispute as to tbe source of tbe waters in the former lake. Tbe plaintiffs contend that it was fed primarily by springs rising on their lands, and only to a minor extent by arroyo runoffs and occasional overflows of tbe river during high water stages. Tbe defendant denies the existence of springs and attributes tbe waters of tbe lake entirely to overflow and seepage from tbe Rio Grande, added to by some arroyo runoffs.
6. Tbe sole support for tbe plaintiffs’ contention is tbe uncorroborated testimony of co-plaintiff Mr. Hunter, who had been living and working within a radius of a few miles from San Marcial during the decade of the 1920’s and was familiar with the town before its destruction in 1929 by tbe *364 flood. He did not see any springs in San Marcial prior to the flood and testified from apparent hearsay that they were there but that the waters sunk into the ground without collecting. He said that he did not actually see any springs until about 1934 or 1935 and these were three springs just north of the township proper which, by 1935, were forming small pools of water which fed the lake until it reached its maximum size about 1947.
7. The Government’s contention attributing the waters of the lake to seepage and overflow from the Rio Grande, and to arroyo runoffs, is based on the testimony of its engineers who have observed the seepage and overflows, and on the comprehensive engineering data concerning this part of the Rio Grande valley which was contained in some detail in the reported facts in Atchison, Topeka and Santa Fe Railway Co. v. United States, 150 Ct. Cl. 339, 278 F. 2d 937. The plaintiffs did not object at trial to the defendant’s request that the court take judicial notice of the relevant findings in the cited case, but the commissioner made no ruling on the request. The relevant findings there, added to the record in the instant case, establish the following facts:
Since about 1880 the right-of-way and the railroad embankment owned and operated by the Atchison, Topeka and Santa Fe Railway Company has extended along the west bank of the Rio Grande between the town of San Marcial and the river. For many years prior to 1929 the embankment and dikes had protected San Marcial from floods, with some exceptions. But in the course of time the heavily silted waters of the Rio Grande had aggraded the bed of the stream to the point that as early as 1904 the surface of the river was higher than the elevation of the town. There were drainage ditches installed in San Marcial as early as 1914 to drain off the water which seeped through the protecting dikes and embankments. The imbalance between the surface of the river and the elevation of San Marcial increased as the river continued to aggrade, so that by 1950 the river was eight to ten feet higher than the lake which had formed over the former town of San Marcial. Through these years the railroad embankment and its bridges had been constantly raised in *365 height and repaired because of flood damage in various years. The unequal elevations as described created hydrostatic pressure which caused excessive seepage from the river through the railway embankment and dikes into the San Marcial area and was regarded as the principal contributor to the lake, augmented at times by overflows from the river and arroyo runoffs. In addition, a large pool of water collected at the north end of the lake but east of the railroad embankment from a drainage ditch which drained off marshy areas in the river valley north of the San Marcial vicinity. It is probable that a considerable quantity of this water seeped into the north end of the lake through the embankment.
None of the numerous witnesses in the earlier case of Atchison, Topeka and Santa Fe Railway Company v. United States, supra, who included highly qualified engineers, hydrologists and geologists, nor the engineers who were witnesses in the instant case, mentioned the existence of springs in San Marcial or the contribution by springs in the formation of the lake. At least one of them was familiar with San Marcial as early as 1925 and, as manager of the conservation project for the Bureau of Reclamation, had devoted extended study to seepage conditions in that immediate vicinity.
8. The evidence as to springs having been the source of of the lake is inconclusive. If there were springs at one time the amount of water flowing from them is not known or susceptible to measurement. Nor can the amount of river water which seeped through the embankment into the lake be measured. However, viewing the evidence as a whole, it is reasonable to conclude that at all times the prime source of water in the lake was seepage from the river, augmented occasionally by river overflows, arroyo runoffs, and some seepage at the north end of the lake from the pool of water formed by the drainage ditch leading down the valley from the marshy areas further north.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *366 of law that the plaintiffs are not entitled to recover and the petition is dismissed, and the Government’s third party petition against the Railway is dismissed.