Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs are the owners of 71 acres of land planted in orange and lemon trees located in Tulare County, California, commonly referred to as the Stone Corral Orchard. They sue to recover just compensation for the alleged taking of this property for public use.
They claim that the defendant in the construction and operation of the Friant-Kern Canal, part of which runs, first, to the east, and then to the south of plaintiffs’ property, has so raised the ground water underneath the Stone Corral Orchard that the soil in the root and agricultural zones has become inundated, thus rendering the land unsuitable for the cultivation and growth of citrus trees. Plaintiffs contend that the defendant has thereby taken its entire orchard and is liable for its full value. In the alternative, they claim defendant has taken a seepage easement under their property and is liable for the amount by which the exercise of such easement has reduced its value.
The defendant denies that there has been a taking of either the fee or an easement within the meaning of the Fifth Amendment. To protect its interest, however, it has filed a contingent claim against the third party defendant, the Stone Corral Irrigation District, a political subdivision of the State of California, contending that in the event the court determines that plaintiffs are entitled to recover, the District, by reason of the contract between it and the United States Bureau of Eeclamation, must indemnify the defendant for such liability.
Did defendant, by the construction of this canal, take either the fee or an easement in plaintiffs’ property, within the meaning of the Fifth Amendment? The facts are set out in great detail in the findings. They show conclusively that the seepage from portions of the Friant-Kem Canal located to the east of plaintiffs’ property was the substantial and controlling cause of the rise in the ground water level in the Stone Corral Orchard. Defendant’s position that seepage is only one of the many factors which caused plaintiffs’ damage is untenable. Defendant says that other factors, such as rain, natural runoff, contribution from natural *229 ground water sources, and drainage resulting from generally-increased irrigation in tbe District through use of canal waters, contributed to the damage; but each of these factors, with the exception of the increased irrigation in the District due to the availability of canal waters, was present prior to opening of the canal in 1950, and none of them ever presented any problem in the operation of plaintiffs’ orchard. Nor does the evidence show that the ground water level on plaintiffs’ property was increased except in a minor way by the increased irrigation in the District. On the contrary, the evidence is overwhelming that the controlling cause of the adverse water condition in the orchard was due to seepage from the canal. The Trial Commissioner has found, and we agree, that but for this seepage problem, these other factors would have had no adverse effect on plaintiffs’ property.
In the instant case, the defendant says that no intent to take plaintiffs’ property was either expressed or can be implied from the defendant’s action. It says that the conditions in the Stone Corral Irrigation District made it impossible for the Bureau of Reclamation to anticipate exactly where the ground water level would rise to a point which would affect adversely any particular property owner’s agricultural operation, and, hence, it is impossible to say that the defendant intended to take this particular property or a seepage easement under it.
The direction of the flow of underground water can be predicted in only a general way, and there was no way to say with certainty exactly what would be the result of seepage from the canal. The Bureau of Reclamation, however, anticipated canal seepage. Its contract with the Stone Corral Irrigation District specifically provided that it anticipated seepage of approximately 2400-acre feet per year. It cautioned the District to keep a constant check on the ground water level, and to use the ground water for irrigation whenever possible. Certainly, the authorities must have anticipated that if the seepage was not sufficiently utilized it might well accumulate and raise the ground water level so as to destroy the agricultural usefulness of at least some of the land. Where this seepage would accumulate was unknown, *230 but that there would be seepage and that it might accumulate somewhere to a harmful extent was apparent.
We reiterate what we said in Cotton Land Co. v. United States, 109 Ct. Cl. 816, that it is not necessary to show that the defendant intended to take plaintiff’s land; all that plaintiff need show is that the taking of its land was the natural and probable consequence of the acts of the defendant. It is not even necessary for plaintiff to show that defendant was aware that the taking of an interest in its property would naturally result from its acts. It is only necessary to show that this was in fact the natural and probable consequence of them.
In the instant case it appears that defendant in fact knew that there would be seepage and an accumulation of water unless it was carried off in some way. The only thing defendant did not know was where it would accumulate. It knew someone’s land might be affected, but not whose. If it were necessary to show an intent — but it is not — an intent to commit acts that would probably result in the taking of some land has been shown. The particular land that might be taken was not within the control of defendant, but depended upon the laws of nature; but defendant did contemplate the possible taking of an interest in that land to which the forces of nature directed the accumulation of water caused by its acts.
We must hold that plaintiffs’ injury was the natural consequences of defendant’s act, and that the defendant has taken a seepage easement under and through plaintiffs’ property. Defendant has not taken the fee in plaintiffs’ land. The use of a portion of it for the growing of citrus trees has been destroyed, but the land is still valuable for the growing of so-called row crops.
The next question to be determined is whether the third party defendant, the Stone Corral Irrigation District, must indemnify defendant for any compensation it must pay plaintiffs. We do not think it is under an obligation to do so.
The Friant-Kem Canal is owned and operated by the Bureau of Reclamation of the Department of the Interior, *231 an instrumentality of the United States, and it is under its exclusive control. The Canal was constructed, as part of the Central Valley Project in California, primarily for irrigation purposes, but also for flood control and the improvement of navigation on the San Joaquin Eiver. The seepage of water from the Canal under plaintiffs’ property was, as we have previously stated, a natural consequence of this construction. The record is clear that the seepage in question was due to the carriage of water in the canal, and that it occurred prior to receipt of any water by the Stone Corral Irrigation District. The latter was in no way responsible for the seepage.
The defendant, however, says that its contract with the District indemnified it against any liability which might arise from canal seepage. Defendant relies upon sections 3(c), 7(c), and 14(e) of the contract. These provisions read in pertinent part as follows:
3(c) The quantities of water to be furnished to the District by the United States pursuant to this contract have been computed on the assumption that approximately two thousand four hundred (2,400) acre-feet of water will seep each year from the Friant-Kern Canal into the strata underlying the lands of the District. * * *
7(c) The United States shall not be responsible for the control, carriage, handling, use, disposal, or distribution of water which may be furnished to the District hereunder, outside the facilities then being operated and maintained by the United States, nor for claim of damage of any nature whatsoever, including but not limited to property damage, * * *.
14(e) No liability shall accrue against the United States, its officers and employees because of damages caused by the operation of the distribution system by the District.
These provisions of the contract do not shift from defendant to the Water District responsibility for the acts of the defendant. The District did not obligate itself to utilize all water that seeped from the canal or to indemnify defendant against liability therefor if it failed to do so. Defendant has no right to recovery over against the Stone Corral Irrigation District.
*232 Finally, what was the extent and the value of the easement which has been taken by the defendant? Plaintiffs’ property is divided into two distinct orchards. Approximately 31 acres in the southern part of the property are planted in lemon trees; the northern section of 35 acres is planted in orange trees. Three of the remaining five acres are devoted to living quarters and farm buildings, and the other two acres are an alkali area which is not utilized for any purpose.[1]
The injurious effect of the cuñal seepage first became apparent to plaintiffs on or about September 30, 1955, and since that time the water level in the orange grove has risen to such an extent that at the time of the trial approximately two-thirds of the orange trees had been destroyed. The remaining one-third located in the south-east portion of the grove appeared healthy, but because of the presence of water in the immediate vicinity of the roots their continued well-being is doubtful. It seems clear that the orange grove is no longer a feasible commercial operation.
The lemon grove to the south, on the other hand, shows no injurious effect from the rise in the ground water in its vicinity. While trees are more resistant to adverse moisture conditions, the continued vigor of these trees is due to the fact that the ground water in this portion has not risen nearly as far as it has in the orange grove. In 1956 all of the orange grove had a ground water table of five feet or less with a substantial portion being two to three feet. However, as of 1958 the water level in the greater part of the lemon grove was approximately eight to thirteen feet, with only a small part of the grove to the north showing a water table of five feet.
While the evidence is clear that canal seepage has caused crippling damage to the orange grove and has in fact rendered its further commercial operation infeasible, this is not true with regard to the lemon orchard. Nor does the evidence introduced at the trial tend to show that in the future the lemon grove will necessarily or even probably *233 be destroyed by canal seepage. The slope of plaintiffs’ property is such that water coming in from the east will generally flow west and north, and water entering the property from the south will also follow this general flow. Water entering from the east or south tends to pass underneath the lemon grove and to flow in the direction of the orange grove. The probabilities are that the lemon grove will not be harmed; at least we cannot say with any degree of certainty that it will be. Plaintiffs have not shown a taking of the lemon grove and are entitled to recover nothing on that account.
Plaintiffs say that the fact that the orange grove was taken constitutes a threat to eventually take the lemon grove. The facts do not support the statement. The lemon grove is closer to the canal than the orange grove, but the water passed under the lemon grove at a depth of from 8 to 13 feet, and then rose. This indicates that the lemon grove is immune from destructive seepage, rather than subject to it. At least there has been no showing that in the natural course of events the lemon grove will be destroyed and, hence, there has been no showing of a taking. If at some later date conditions should change and the water table under the lemon grove should rise and destroy the lemon trees, plaintiffs would then have a cause of action, but not before. Cf. Atchison, Topeka and Santa Fe Ey. v. United States, 150 Ct. Cl. 339.
Plaintiffs’ case does not come within the rule that, where the taking of a part of a tract of land renders valueless the remainder, the owner may recover the value of the whole tract. The value of the lemon grove was as great after the destruction of the orange grove as it was before.
We hold that defendant is liable to plaintiffs for the taking of a seepage easement at a depth of from two to three feet and below under the north 35 acres of plaintiffs’ property, and that plaintiffs are entitled to just compensation therefor.
The valuation of the orange grove, destroyed by the taking of the easement, before September 1955, the date of the taking, has been fixed by the Trial Commissioner at $3,500 per acre, and after the taking, at $650 per acre. This finding *234 is supported by substantial evidence and we adopt it as the finding of the court. However, we do not think it necessarily follows that just compensation is the difference between the two. The construction of the Friant-Kern Canal was the cause of the destruction of plaintiffs’ orange grove, but, at the same time, it probably greatly enhanced the value of plaintiffs’ land for other uses. In arriving at “just compensation” one ought to be offset against the other. Dick v. United States, 144 Ct. Cl. 424; and compare United States v. Miller, 317 U.S. 369, 375; Richelderfer v. Quinn, 287 U.S. 315, 323.
In addition, the report of the Trial Commissioner shows that after the date of the taking plaintiffs continued to gather oranges from the grove and market them. If the profits derived therefrom exceeded the profits to be derived from utilizing the land as so-called bare lands, that is, for the growing of row crops, the excess should be deducted from the difference in the value of the land before and after the taking.
The report of the Trial Commissioner does not deal with either of these two questions; nor have the parties requested findings thereon; however, the court thinks that these are proper matters for consideration and, hence, on its own motion, it remands the case to the Trial Commissioner for the sole purpose of taking testimony on these two questions. Upon the incoming of the Trial Commissioner’s report, the parties may file exceptions thereto, supported by such briefs as they care to file.
Defendant’s contingent claim against the third party defendant will be dismissed.
It is so ordered.
Durpee, Judge; Laramore, Judge; MaddeN, Judge, and JoNes, Chief Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner S. R. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, L. L. Richard, Margaret K. Richard, Ida Ruth Richard, John F. Whitmore, R. E. Richard and *235 Kenyon E. Richard, are citizens of the United States and are the sole members of a partnership known as Richard Company. Said company will hereinafter be referred to as the plaintiff.
2. Plaintiff has at all times pertinent herein been, and, except as hereinafter mentioned, is, the owner and in possession of the following described real property, consisting of 80 acres, located in Tulare County, State of California:
Lots 18, 19, 22 and 23 of the Miller-Tessman Tract all within Section 4, Township 17 South, Range 26 East, M.D.B. & M.
Excepted therefrom, however, is that portion thereof, consisting of 9 acres taken by defendant by condemnation in 1947 and recorded in Book 1233 at page 448 of Tulare County Official Records and more particularly described as follows:
A parcel of land situate in the Southwest quarter of Section 4 in Township 17 South of Range 26 East of the Mount Diablo Meridian including a portion of Lots 22' and 23 of the Miller-Tessman Tract as said lots are shown on the amended map of the Miller-Tessman Tract recorded May 8, 1917, in Volume 16 at Page 6 of Maps in the Office of the County Recorder of said Tulare County containing an area of 9.1 acres more or less and described as follows:
Beginning at a point in the East boundary of the Southwest quarter of said Section 4 distant along said East Boundary North 4°27' East 394.9 feet from the South quarter corner of said Section 4 thence running along said East boundary South 4°27' West 394.9 feet to the South quarter corner of said Section 4 thence running along the South boundary of said Section 4 North 89°32' West 20.0 feet to the Southeast corner of said Lot 23 thence running along the South boundary of said Lots 23 and 22 as follows: North 89°32' West 689.5 feet; thence North 70°09' West 262.8 feet thence South 77°15' West 381.7 feet to the Southwest comer of said Lot 22 distant along the South boundary of said Section 4 South 89°32' east .1332.6 feet from the Southwest corner of said Section 4 thence running along the West boundary of said Lot 22 North 4°51' East 458.4 feet; thence South 66°32' East 359.7 feet; thence South 79°00' East 336.8 feet; thence North 84°51' East 482.5 feet; thence North 63°18' East 177.7 feet to a point in the East *236 boundary of said Lot 23 distant along said East boundary 384.2 feet from the Southeast corner of said Lot 23; thence continuing North 63°18' East 23.4 feet to the point of beginning.
Thus, the property presently owned by plaintiff, and herein involved, consists of 71 acres.
3. The property described in finding 2 is commonly referred to as the “Stone Corral Orchard”. It was purchased by plaintiff in 1922 and at that time consisted of the 80 acres referred to in finding 2, most of which were planted with orange and lemon trees. After the condemnation of the 9 acres referred to in said finding 2, which was on the southern portion, the remaining 71 acres of the property has continued to be operated as an orange and lemon orchard.
Thirty-seven acres on the north side of the orchard is planted with orange trees, and 31 acres on the south side with lemon trees. Living quarters for the resident employee and farmstead buildings on the east side near the north end of the property, and roads, comprise in all approximately 3 acres.
4. Prior to the purchase of the land in 1922 by plaintiff, it had been planted as a citrus orchard for 6 or 7 years but because of a shortage of water it had not developed properly. Because there is limited rainfall, citrus culture in this area is dependent upon a supply of irrigation water. Shortly after purchasing the property, plaintiff drilled two wells in the northwest corner of the orange grove to a depth of 275 feet to supply additional water. These wells were approximately 175 feet deeper than was usual in the area. However, by 1929, the production of well water had diminished to the point where it was again necessary to find an additional source of water. A 320-acre tract, which lay across a gap approximately a mile to the southwest of plaintiff’s property, known as the Monte Piedra property, of which 42 acres consisted of an orange grove, was then available for purchase. This property had a surplus supply of water. Plaintiff bought the Monte Piedra property and piped a supply of water to its Stone Corral Orchard across the intervening hills. With these two sources of supply, i.e., the wells and the water from its Monte Piedra property, plaintiff was thereafter able to provide an adequate amount *237 of irrigation water for the citrus trees in its Stone Corral Orchard.
5. The soil of the Stone Corral Orchard is of a type which has proved to be well adapted to the cultivation and production of citrus fruits, except for approximately 2 acres in the western part of the orchard and lying in the orange grove, where an alkali condition exists. The climate provides the warm thermal conditions necessary to successful citrus culture. The oranges historically have matured early as compared with those in other groves in the Tulare County area. In past years this has nearly always resulted in higher market returns for the fruit, as contrasted with the prices received for later maturing oranges. Prior to the fall of 1955, the orange trees were generally healthy and productive of better than average quality and quantity of oranges.
6. The south boundary of the property is contiguous to the right-of-way for the Friant-Kem Canal (hereinafter referred to as the “Canal”). The 9 acres acquired by defendant by condemnation in 1947, referred to in finding 2, were used as part of the right-of-way for the canal. The surface of the land slopes to the northwest, the high point of the surface being immediately west of the southeast corner of the property and the low point being near the northwest corner. There is a fall to the north along the east edge of 12 feet, a fall to the west along the north edge of 8 feet, and a fall to the north along the west end of approximately 17 feet.
7. Prior to 1950, defendant, as part of the Central Valley Project in the State of California, constructed the Canal primarily for irrigation purposes but also for flood control and the improvement of navigation with respect to the San Joaquin Eiver. The Canal is owned by defendant and, since 1950 and to the present, it has been maintained and operated by the Bureau of Eeclamation of the United States Department of the Interior (hereinafter referred to as the “Bureau”). It is approximately 153 miles long, running through Madera, Fresno, Tulare and Kern counties of the State of California, from Friant Dam on the San Joaquin Eiver in Madera County, to a terminus in the Kern Eiver near Bakersfield in Kern County, California. It delivers *238 great quantities of water to many thousands of acres of farmland located in various irrigation and water districts in the southern portion of California’s Central Valley. Approximately 128 miles of the Canal, constituting all but 25 miles, are lined with concrete to prevent seepage of its waters into adjacent lands. Primarily because of the cost, the remaining 25 miles are not so lined and have nothing but earthen channels and banks to contain the Canal waters. These earthen channels and banks were compacted where the Bureau, at the time the Canal was constructed, deemed this to b8 necessary, as hereinafter more particularly set forth. At no time prior to the construction and operation of the Canal did plaintiff ever experience any excess water problems in connection with its Stone Corral Orchard.
8. On or about September 30,1955, it first became apparent that the ground-water level in a part of the Stone Corral Orchard was excessively high. Very shortly thereafter, serious damage to the orange trees began to appear. Immediately prior to this time, the entire 71 acres constituting plaintiff’s orchard had a fair market value of $193,900, calculated as follows:
As stated, the orange grove consisted of 37 acres. However, as set forth in finding 5, approximately 2 acres in this grove are affected by an alkali condition, which makes them unsuitable for citrus culture. The remaining 35 acres had a fair market value of $3,500 per acre, so that this portion of the orchard had a total fair market value of $122,500. The two alkali acres had a nominal value of $100 per acre. The lemon grove consisted of 31 acres. At a fair market value of $2,200 per acre, this portion of the orchard had a total fair market value of $68,200. The remaining 3 acres, including the buildings and roads thereon, had a fair market value of $1,000 per acre, or a total of $3,000. Thus, the total fair market value of the 71 acres as of September 30, 1955, was:
Orange grove-35 acres @ $3,500 per acre=$122, 500
Lemon grove-31 acres @ 2,200 per acre= 68, 200
Alkali- 2 acres @ 100 per acre= 200
Buildings and roads- 3 acres @ 1,000 per acre= 3,000
71 acres 193,900
*239 Absent suck excessive water and damage, this fair market value would have continued to the present without substantial change.
9. This action was instituted on July 2, 1957, alleging, among other things, that because of the activities of defendant in its construction and operation of the Canal, the ground waters underneath the Stone Corral Orchard were raised so high as to saturate it or a number of areas thereof and thereby to inundate the soil in the root and agricultural zones, thus rendering the land unsuitable for cultivation and growth of citrus trees. Plaintiff contends that defendant has thereby taken its entire orchard and is liable for the full value thereof, or, in the alternative, that defendant has taken a seepage easement thereunder and is liable for the amount by which the exercise of such easement has reduced the value of the property. Defendant in turn has asserted a contingent claim against the third-party defendant herein, the Stone Corral Irrigation District (hereinafter called the “District”), a political subdivision of the State of California, duly organized and existing under the laws thereof, with its principal place of business in Visalia, California, contending that, in the event the court determines plaintiff is entitled to recover, the District is, by reason of the laws of the State of California and a contract dated February 17, 1950, entered into between the District and defendant, liable over to defendant for such liability as defendant may be found to have to plaintiff.
10. The Central Valley Project was originally approved for construction in 1935. The plan contemplated, among other things, the construction of a dam called Friant Dam across the San Joaquin River and the diversion of that water or part thereof through the Canal, to be sold to various irrigation districts.
11. The District was organized in 1948, under the laws of California pertaining to the formation and operation of irrigation districts. It was formed to bring in a supplemental water supply and was also empowered to build distribution systems. As political subdivisions of the State, irrigation districts are public agencies. They are operated by a board of directors elected by registered resident voters *240 of the district. They have the power to levy assessments and collect taxes. In 1947 only 30 percent of the area within the District was irrigated. In 1949 irrigation was applied to 1,750 acres. In 1950 the gross area of the District was 4,927 acres, with a productive irrigable area of 4,502 acres. In 1956 the gross area of the District was 5,673 acres, with a productive irrigable area of 5,181 acres. Since that time, 20 additional irrigable acres have been added.
12. The District lies generally in parts of Townships 16 and 17 South, Ranges 25 and 26 East. Its greatest length north and south is 3% miles and its greatest width east and west is 3 miles. It is bordered on the east and north by the foothills of the Stokes Mountains and the Colvin Mountains. The mountains form a cove around part of the District. The Canal lies generally at the base of the mountain ranges. As the Canal enters the District area, it flows east through Section 25 of Township 16 South, Range 25 East, and Section 30 of Township 16 South, Range 26 East. In the east half of Section 30, Township 16 South, Range 26 East, it curves to the south, flowing generally south and east through Section 32 and part of Section 33 of Township 16 South, Range 26 East and Section 4 of Township 17 South, Range 26 East. In the southeast comer of Section 4, Township 17 South, Range 26 East, the Canal curves to the west. It turns abruptly south near the corners of Sections 4, 5, 8 and 9 of Township 17 South, Range 26 East, cuts through a knoll or hill which juts into the southeast corner of said Section 5, and proceeds in a southerly direction through Sections 9 and 16 of Township 17 South, Range 26 East. Both the Stone Corral Orchard and the Monte Piedra property lie within the boundaries of and are subject to the District.
13. Approximately 4 miles of the earth-lined portion of the Canal borders on the District, being that portion of the Canal extending south from Section 25, Township 16 South, Range 26 East, to Section 4, Township 17 South, Range 26 East. The earth-lined portion stops and the concrete-lined portion begins at station 3369 + 00 on the Canal, which is a point slightly east of a point where the east boundary line of plaintiff’s property would intersect the Canal if it were extended south. The Canal is concrete-lined from said sta *241 tion 3369+00 and extending west across the area which borders on the southern boundary of the Stone Corral Orchard and continues to be concrete-lined as it proceeds south. Plaintiff’s orchard lies immediately adjacent to the north bank of the Canal near Mud Springs Gap in Tulare County, California. The Canal is earth-lined as it proceeds from approximately station 3340+00, which point is between % and % mile due east of the northeast corner of plaintiff’s property, southerly and southwesterly around the eastern and southern boundaries of the property referred to as the Binns property, which consists of a field of approximately 60 acres lying between plaintiff’s property and the Canal, to said station 3369+00. The earth-lining commences at a point approximately 100 feet east of the orchard and continues, as it borders or runs through the District, for a distance of approximately 4 miles east and north upstream therefrom. The earth-lined section so running south and southwesterly forms a kind of cove to which the Binns property is adjacent. The eastern line of plaintiff’s orchard adjoins the western line of the Binns property. The relation of plaintiff’s orchard to the Binns property and to the unlined portion of the Canal is shown on plate 1 of plaintiff’s exhibit 27, which is incorporated herein by reference. As to the unlined portion of the Canal in the immediate vicinity of the orchard, part is of the natural material encountered in the excavation and part is of compacted earth. In the vicinity of plaintiff’s orchard, the Canal has a capacity of approximately 4,000 second-feet of water and the normal level of the water is of substantially greater elevation than the surface elevation of the orchard.
On the eastern and southern sides of the Canal opposite the Stone Corral Orchard, there is a foothill and mountainous area of higher elevation and of steeper gradient than that of the orchard and other agricultural tracts lying north and west of the Canal. At the southeast corner of the orchard, where the Canal turns northward, it remains within 1,800 feet or less of the east boundary of the property for a distance of over one-half mile. The bottom of the Canal is of higher elevation than that of over two-thirds of plaintiff’s orchard.
*242 14. In the construction of the Canal a determination as to whether to line it with concrete through each particular area was made upon the basis of an examination of the materials through which it passed. Geological studies had been made and, where it appeared that the materials were relatively impervious, an earth-lined canal was authorized. The engineers in the field made the final determination of the type of lining to use in the earth-lined areas based on their observations. In some instances, the earth-lined portions of the Canal were lined with compacted clay; in other instances, where it appeared that the natural soils and materials were relatively impermeable, only the walls of the Canal were lined with compacted clay and the floor was unlined. However, loss of water through seepage in the areas unlined with concrete passing through the District was anticipated by the Bureau. As noted, above, the primary consideration in leaving portions of the Canal unlined was cost, since it is considerably more expensive to line the Canal with concrete.
15. Preliminary to entering into a contract for the sale and delivery of irrigation water by the Bureau to the District for the District to distribute to its members, the Bureau made various studies relating to the geographic area of the District, including the geology, the ground-water tables, the soil classification, the agricultural uses, and the crop requirements. The results of the studies are incorporated in two reports, one, dated January 1950, called “Factual Report, Stone Corral Irrigation District, Central Yalley Project, California,” and the other, dated November 1950, called “Technical Studies in Support of Factual Report, Stone Corral Irrigation District.” Among other things, the reports included recommendations for the construction of a proposed distribution system and for pumping ground water.
The “Factual Report” stated in part:
* * * The entire district, except for 124 acres, lies below the Friant-Kern Canal, which will furnish water service from the Central Yalley Project. The district’s board of directors, by resolution dated January 12, 1950, approved a form of contract providing for a supplemental water supply and for construction *243 of a distribution system, cost of which is not to exceed $777,000. * *.*
The district has a small local water supply subject to diminution in the future by increased pumping in adjacent areas. Ultimately, local supply will consist only of utilizable rainfall and foothill drainage. Seepage from the Friant-Kem Canal, which has clay lining in the reach adjoining the district, will become part of the district’s supply, possibly amounting to 2,400 acre-feet annually. If canal losses are at this figure, the district may have to pump 5,500 acre-feet per year. The district should be allotted a supply of class 1 water from the Friant-Kem Canal, ranging from 7,700 to 10,000 acre-feet annually, depending upon canal losses. * * *
Preliminary design for the distribution system to serve the district provides for about 25 miles of concrete pipe ranging in size from 10 to 36 inches in diameter. The system will consist of three main laterals on the gravity side with sublaterals at half-mile intervals. To serve the land above the canal, lift pumps of 2 second-feet capacity are provided. One will pump under a total head of about 16 feet and the other under a total head of approximately 144 feet. Cost of pumping installations is estimated at $32,300. Estimated cost of concrete pipe in place is $387,721. Designed capacity of the system is 1 cfs to 80 acres continuous flow and delivery of 2 cfs at farm outlets on a rotation basis. Total estimated cost of the system of $777,000 represents an average cost of $157.70 per acre on a gross area basis, or $172.59 per acre for the ultimate irrigable area. This will be repaid in a 40-year period at the rate of $19,425 annually, or $4.31 per irrigable acre per year.
*****
1. Purpose and scope. Purpose of this report is to present the factual information necessary for negotiation of a contract between the United States and the Stone Corral Irrigation District, providing for irrigation water service to be furnished to the district through facilities of the Central Valley Project, California, and for construction of a lateral distribution system for the district. The report will further be used to substantiate a request of the Congress for appropriation of the funds required to cover the cost of constructing the lateral distribution system. * * *
*244 7. * * * The canal runs approximately along the north and east boundaries of the district, practically all of which lies below the canal. This reach of the canal is about 61 miles from Friant Dam, measured along the canal. * * *
50. Under present conditions, slopes are westerly and northwesterly, and southern sources of recharge are apparent. A noticeable lowering of the water table, averaging about 6 feet over the district, has taken place since 1945. This has been caused by an increase in cropping in anticipation of the acquisition of supplemental water and by the recent below-normal rainfall.
51. In 1921, mean depth to water in the district area was 20 feet, as compared with about 40 feet in 1948. During the period 1933-35, mean depth to water was 55 feet. Depths at present vary from less than 25 feet to more than 50 feet. In this district, where a large drawdown is required to supply a well and the alluvial cover is thin, many areas face additional reductions in well yields, if supplemental water is not brought in to reduce the overdraft on ground water.
52. * * * Net change in [ground] storage during this period [1921-22 to 1947-48] shows an average overdraft of 300 acre-feet per year. Total overdraft during the period was 7,400 acre-feet. * * *
57. Friant-Kern Canal losses. It is estimated that losses from the Friant-Kern Canal will be 2,400 acre-feet per year into the district. Because the foothill supply is small, it is probable that accretions to ground water caused by losses from the canal can be determined by ground-water measurements and estimates of changes in storage within the area. It is probable, also, that initial canal losses will be greater than ultimate losses, as they will tend to be reduced by silting of the canal. It will be several years, therefore, before this quantity can be finally determined.
‡ ‡ ^
62. * * * When canal losses have been determined, they will be deducted from supplemental supply and added to pumping demand. * * *
64. Grovmd-water observations. It will be necessary for the district to maintain a program of measurements of depth to water to enable it to observe water-table conditions and to control water levels by pumping. The district’s program for supplemental water from year to year should be such that necessary pumping for drainage is maintained in the en *245 tire area. It will be the responsibility of the district to study ground-water conditions and provide drainage pumping where necessary.
Hi sj: H* H*
The “Technical Studies” report stated in part:
4. Contractual history. The Bureau of Reclamation has maintained contact with the board of directors of the Stone Corral Irrigation District since its formation in 1948. By letter of September 8, 1948, the district requested the necessary studies for the determination of supplemental water requirements and for design and construction of a distribution system. The chapters in this report cover studies made in accordance with the district’s request. After a number of meetings and considerable correspondence between the district and the Burean, the directors, by resolution adopted January 12,1950, approved a contract for water service and the construction of a distribution system.
5. History and, development. The Stone Corral Irrigation District was organized in July 1948 for the purpose of contracting for a water supply from the Central Valley Project and for the construction of a distribution system by the government. Gross area of the district is 4,927 acres.
H« Hi H? H* H*

General Description

7. Location. The Stone Corral Irrigation District is situated in Tulare County, California, approximately 30 miles southeast of Fresno and 10 miles north-northeast of Visalia. It occupies portions of townships 16 and 17 south and ranges 25 and 26 east of the Mount Diablo base and meridian. Its greatest length north and south is 3^4 miles, and its greatest width east and west is 3 miles.
8. The Friant-Kern Canal, a major feature of the Central Valley Project now being constructed to serve the east side of the San Joaquin Valley, will furnish water service to the district. The canal runs approximately along the north and east boundaries of the district with practically all of the land lying below the canal. * * *
* * * * *
11. Soils. The district consists chiefly of rolling terrace land with hardpan soils and smooth lands *246 with adobe clay soils. Less extensive are alkali lands in the southwest part of the district, the recent alluvial fans in the northeast portion, and the small tracts of foothill land along the eastern boundary. *****
24. As shown in the preceding tabulation, class 1 lands are confined to the smooth gently sloping lands of recent alluvial fans with deep permeable soils that are highly suitable in all respects for irrigated cropping.
*****
48. The area of class 1 land is less than 100 acres: hence this class is considered insignificant in relation to the estimated future crop development. * * *
*****

Geologic Features of the District

14. The foothill watersheds [of the District] are exceedingly small, since Cottonwood Creek, a southerly flowing stream two miles east of the Stone Corral District, intercepts most of the runoff. A few small canyons in the foothills debouch on young alluvial fans, but these canyons rarely contain running water.
»{» *}•
18. Material classed as “Old Alluvium” is at the surface throughout most of the Stone Corral District. It includes fluvial sands, silts, clays and gravels; sorting is usually poor, all the grade sizes being represented in nearly every bed. The sands are generally arkosic, angular to subangular, friable to loose, and are various shades of brown, reddish-brown, tan and grey. Gravels consist of subangular to sub-round grains of granitic rocks. Pebbles and cobbles are mostly rather well rounded. Varying amounts of silt and clay occur in all coarser material and form the only bonding agents observed beneath the immediate surface layers. These finer materials are decomposition products filling pore spaces between grains and reducing permeability. The clays are often deeply stained by iron oxides which also result from weathering and which account for the common reddish-brown color of the sands to which they are interstitial. Large clay lenses containing variable amounts of silt, sand, and scattered granules and pebbles are extensive throughout the Old Alluvium. They are not continuous enough to act as confining *247 layers, but do restrict ground-water migration and storage. * * *
*****
58. Yowng Alluvium. On tbe central part of tbe fan of tbe Kaweah River to the south, most of tbe ground-water reservoir is contained within sediments of tbe Young Alluvium. Young sediments of tbe Stone Corral area are similar to those of tbe Kaweah, but have little storage capacity because of their restricted distribution, thinness and lack of significant recharge. The relatively high permeability of the sediments, however, make them important in controlling the direction of migration of near-surface waters. Specially designed wells (as horizontal drainage pits) could be used on the small foothill fans to intercept such migrating water.
‡ ^ ‡ ‡

Summary

1. * * * Nearly all the district is immediately below and partly encircled by the Friant-Kern Canal. The 414 mile reach of the canal along the district has a selected clay blanket lining. Losses from the canal will accumulate in the district and will become part of the district’s water supply. Preliminary estimates of such losses total 2,400 acre-feet annually, but the earth lining may prove more effective than estimated. The district lies in a thinly alluviated cove surrounded by low Sierra Nevada foothills, of limited drainage area.
* * * * *
3. Ground-water recharge from which the district pumps its entire supply is derived from the following sources: (1) induced percolation and seepage from adjacent areas; (2) small quantities of deep percolation from rainfall; and (3) limited drainage from foothill sources.
* Hí * * *
5. The supplemental supply required is estimated at 10,100 acre-feet annually if Friant-Kern Canal losses prove to be negligible and 7,700 acre-feet annually if losses are 2,400 acre-feet as originally estimated. * * *
6. A careful check on changes in the ground-water levels should be maintained so that advance notice of undesirable conditions within the district will be available and corrective measures can be undertaken. The changes in ground-water storage will give a more *248 accurate measure of accretions to ground water than is possible to estimate in advance of actual irrigation operations.
*****

Foothill drainage

19. * * * An estimate of average annual runoff [of foothill drainage] per square mile is 20 acre-feet. This would be an average of 150 acre-feet per year for the entire drainage area. * * *
* * * qqie foothill drainage is the only direct recharge to ground water the district receives, except deep percolation from rainfall.
$f: $ ‡ ‡ #
40. Friant-Kern Canal losses. Estimates of Friant-Kern Canal losses were made by Bureau geologists based on permeability tests in Orange Cove District. These estimated losses totaled 2,400 acre-feet per year for the reach of the canal along the Stone Corral District boundary. A quantity of water is to be turned into a canal for a short period of time this year. More deliveries are expected in 1950 and 1951. The foothill supply is small and Friant-Kern losses in the Stone Corral area can probably be determined by ground-water measurements and estimates of changes in storage within the area, if they are appreciable, even though they may be too small to measure by cux'rent-meter methods. Presumably initial canal losses will be somewhat greater than final losses and these early losses can be considerably reduced by silting. Thus, a few years will probably be required for their final determination.
48. Demand for project water. * * * Two estimates of demand are made. The first estimate assumes that the Friant-Kern Canal is perfectly tight, and that no losses from the canal become a part of the ground-water supply. * * * The second estimate assumes that Friant-Kern Canal losses of 2,400 acre-feet per year become part of the ground-water supply. * * *
‡
52. Water management plan for the district. It will be necessary for the district to maintain a program of measurements of depth to water in the district to observe water table conditions. This is necessary in order to control water levels by pumping. The district’s program for supplemental water from *249 year to year should be such that in the entire area, necessary pumping for drainage is maintained. It should be the responsibility of the district to provide pumping in the zone of thin cover when necessary, until drainage conditions are established. A definite curtailment of supplemental supply in areas of too high water table will be necessary.
53. The exact determination of optimum supplemental supplies will await the field determination of the net result of all the variables affecting it. Rise or fall of the water table for a given application of water will probably be the best method of determining the optimum supply.
«£»

Conclusions and Recommendations

58. Friant-Kern Canal seepage losses will become part of the district’s supply. Although these have been estimated as totaling 2,400 acre-feet per year, they cannot be accurately determined in advance of canal operation. They may prove to be less than 2,400 acre-feet per year and will probably lessen with operations due to silting. Adjustments for seepage will be provided in contractual quantities.
59. An ultimate annual total of 5,500 acre-feet of pumping may be required by the district if canal losses are 2,400 acre-feet per year. Some of this pumping may have to be done in poor pumping zones. This pumping will drain the ground water accretions in areas of low permeability to prevent too high water tables. Drainage of canal losses and deep percolation from irrigation and rainfall should be pumped from more favorable areas wherever it is possible to do so.
60. It is recommended that the district be allotted a class 1 supply of supplemental water. Ultimately the supplemental supply required will be from 7,700 to 10,100 acre-feet depending on canal losses.
61. A program of measurements of depths to water in the district should be maintained by the district to observe water table conditions so that these may be controlled by pumping. This will be particularly important during the growth of the district.
16. A contract was entered into and approved February 17, 1950, between the District and the Bureau, which provided, among other things, as follows:
3(c) The quantities of water to be furnished to the District by the United States pursuant to this contract *250 have been computed, on the assumption that approximately two thousand four hundred (2,400). acre-feet of water will seep each year from the Friant-Kern Canal into the strata underlying the lands of the District. * * *
7(c) The United States shall not be responsible for the control, carriage, handling, use, disposal, or distribution of water which may be furnished to the District hereunder, outside the facilities then being operated and maintained by the United States, nor for claim of damage of any nature whatsoever, including but not limited to property damage, * * *.
14(e) No liability shall accrue against the United States, its officers and employees because of damages caused by the operation of the distribution system by the District.
At this time, the only facilities then being operated and maintained by defendant in the District was the Canal itself. Defendant had no contractual relationships with any individual property owner, its only contractual relationship being, in this instance, with the District.
The District is not billed, nor does it pay, for any ground water seeped into the District from the Canal. The seepage from the Canal enters the underground stratas lying beneath the land of the owners thereof and situate in the District directly without passing through any facilities of the District. As of 1955, the District had no facilities in the form of a regular closed distribution system. The system contemplated by the reports referred to in finding 15 had not as yet been constructed.
17. The first deliveries of water in the Canal were made in 1950. The deliveries of Canal water to the District for each separate year have varied, depending on the District’s requests, from 7,000 to 10,000 acre-feet from 1951 to 1957. The following figures represent the delivery in acre-feet of water for each of the indicated years: 1950, 1,424 acre-feet; 1951, 7,064 acre-feet; 1952, 7,660 acre-feet; 1953, 8,489 acre-feet ; 1954, 9,700 acre-feet. Plaintiff began using water from the Canal on its Stone Corral Orchard in 1950 and continued to use it until 1955.
18. In connection with the administration of the contracts which the Bureau had not only with the District but also with other irrigation districts along the Canal, records are *251 kept and tests are made relating to the use of water and the depth to ground water. The available water subject to sale through the Canal is always in short supply and it is therefore necessary to allocate carefully the water to the various districts. A proper working of the entire system depends upon each district using its local supply, pumping its ground water, and calling for deliveries from the Canal only for a supplemental supply.
After the operation of the Canal commenced, the rapidly rising ground waters within the District caused concern. Therefore, intensive tests were conducted in the summer of 1955. Among other tilings, a small swamplike area appeared in the northwest corner of the Binns property, immediately across the farm road from the northeast corner of plaintiff’s orange grove.
On or about September 30, 1955, a Bureau employee who was measuring well levels called plaintiff’s attention to the fact that the water level in a well near the farmstead in the Stone Corral Orchard was within 18 inches of the surface of the ground. Shortly thereafter, it was observed that a substantial number of orange trees in the north portion of the grove were rapidly defoliating and dying. Plaintiff immediately began an investigation to determine the cause of these conditions. It soon came to the conclusion that they were the result of an excessively high water table in the grove and that the excessive water was coming from the Canal. Early in 1956 plaintiff conferred with Bureau officials with respect to this problem. As a result, an investigation was begun by both the Bureau officials and plaintiff to ascertain the cause and source of this excessive water.
19. A Bureau report dated February 1956 called “Stone Corral Irrigation District, Water Supply and Utilization” stated in part:
The problem. The Stone Corral Irrigation District has been enlarged from an original area of 4,927 acres to a present area of 5,673 acres. Additional Central Valley Project water has been reserved for the included 746 acres. * * *
The district is considering a further inclusion of 685 acres, bringing the area to 6,358 acres. * * * Recent studies have shown that the local ground *252 water supply is greater than previously estimated, and that the CVP water now reserved for Stone Corral would be sufficient to meet the water needs of the enlarged district.
The Bureau of Reclamation in a letter of August 12, 1955, offered to amend the Stone Corral contract to provide 8,800 acre-feet of class 1 water for the present district area of 5,673 acres, or 10,000 acre-feet if the district is enlarged to 6,358 acres, providing appropriate arrangements are made for construction of the distribution system. The present more detailed study shows the amount of class 1 water for the present district should be 8,900 acre-feet, and for an enlarged district it is still 10,000 acre-feet.
These water amounts are intended to supplement ground water derived from local runoff and from Friant-Kern Canal seepage. The farm delivery requirements of lands in the district can be met in part from the imported surface supply, but part of the supply must come from groundwater. Removal of groundwater also is essential to avoid drainage problems.
The potential drainage problems appear to be most serious in the northeast or upper part of the district, [the area where plaintiff’s orchard is located] which is the area where recovery or disposal of groundwater is most difficult. In the southwest or lower part of the district ground-water levels are lower and recovery is easier.
The problem then is one of recovery of ground-water supplies to help meet farm delivery requirements and to avoid drainage problems. The drainage problem involves, to some extent at least, the recovery of groundwater in the upper area for use in the lower part of the district.
$ $ $ $ $
Description of units. Unit I, [where plaintiff’s orchard is located] consisting of 1,810 acres, is made up of the area lying immediately below the canal, plus the few small areas above the canal. * * * The rise in water level has averaged 5.2 feet a year from spring 1950 to spring 1955. * * * Much of this area faces an immediate drainage problem.
* # * sf«
Removal of excess water. The removal of excess water may be done in any of several ways. Following are some suggested methods: Open ditch drains; *253 buried loose joint tile drains; or additional wells. A detailed study should be made to determine which is the most practical method for the district to use.
*****
Conclusions. Ground water levels have risen rapidly in Stone Corral Irrigation District since 1950 with the use of Central Valley Project water. In Unit I, covering one-third of the area, on the north and east sides of the district, the average depth to water in the fall of 1955 was about 11 feet. Based upon the trend of the past few years, serious drainage problems may be expected in at least portions of this area within a year or two.
The solution to the potential problem is the removal of some of the excess groundwater by increased pumping, or the installation of open or tile drains. The excess groundwater in Unit I from 1950 to 1955 averaged 664 acre-feet per year. Under ultimate conditions it is estimated that in Unit I, 2,200 acre-feet must be removed from the underground by wells or drains, to maintain a stabilized groundwater condition and to prevent drainage problems. It is estimated that a maximum of 2,060 acre-feet has been pumped in the past, requiring the removal of an additional 140 acre-feet per year. However, the estimate of past pumping is based upon meager data, and the required additional ground-water removal may prove to be substantially greater.
Additional data, and analyses are needed for a full understanding of the potential problems and possible solution.
Recommendations. It is recommended that the district contract for 8,900 acre-feet of class 1 water for the present district of 5,673 acres. If the district is to include an additional 685 acres as contemplated then it is recommended the contractual amount be 10,000 acre-feet of class lwater.
It is further recommended:
(1) That the district employ an engineer to review the general water supply and drainage situation in Stone Corral Irrigation District.
(2) That the district and the Bureau of Beclamation cooperate in making a survey of all existing wells within the district, in order to determine the extent to which ground water might be utilized and regulated through existing facilities.
(3) That the district consider alternative means of controlling drainage, either with additional pump *254 ing from wells, or installation of drains, and decide upon a course of action.
20. After the study of the increase in the ground waters was completed, the Bureau concluded, on the basis of the material available, that seepage through the Canal to the District from 1950 to 1958 totaled approximately 2,400 acre-feet of water per year in accordance with the preliminary estimates. This conclusion was reasonable.
The Bureau originally anticipated that the District would either provide for pumping of the ground water which would seep from the Canal to the District or that its members would pump sufficient amounts of such water. No effori had been made by the District through any District facilities to capture and use such water, although individual members, including plaintiff, did indulge in pumping.
21. Drainage problems within irrigation districts are not uncommon. When water is delivered to a district through its irrigation facilities it sometimes happens that a groundwater or drainage problem is created. Many irrigation districts either take care of such drainage problems or form comparable drainage districts. However, there is no evidence in this case that the rising ground-water problem in the District has any relationship to any irrigation facilities constructed, used, or maintained by the District to distribute or convey the Canal water to its members. While the increase in the ground-water table referred to in this case is general throughout the District, and will become increasingly acute absent some effective steps to control it, the record contains no evidence of damage to, or interference with the uses of, any District member’s property other than plaintiff’s.
22. (a) The investigation carried on by the Bureau and plaintiff with respect to the ground-water conditions in the Stone Corral Orchard continued during the years 1956, 1957 and through at least the first-half of 1958. The results thereof confirm the conclusion that the excessive ground water in plaintiff’s orange grove was and is serious and critical, and that the substantial and controlling cause of this condition is the Canal water that seeps from the Canal where it is not lined with concrete and flows across the Birins *255 property into plaintiff’s orchard. This condition will in all probability become worse, absent effective measures to control or stop the seepage from the Canal, or some effective drainage system installed. As stated, during the time the Canal was being constructed and at the time it was put into operation, the Bureau anticipated that there would be such seepage from the Canal into the District and that this might well cause excessive ground water in that area.
Other factors such as rain, natural runoff, contribution from natural ground-water sources, such as springs, and deep-water percolation and drainage resulting from generally increased irrigation and pumping in the District though use of canal waters, may also contribute to the high ground-water problem in the District generally. However, they contribute to the condition in plaintiff’s orchard only in a minor way. But for the seepage problem, these other factors would have had no adverse effect on plaintiff’s orchard. All of these factors, with the exception of the increased irrigation and pumping in the District due to the availability of canal waters, were present prior to the building of the Canal, and none of them ever presented any problem in the operation of plaintiff’s orange grove.
(b) Although, as stated, the Bureau anticipated canal seepage and, absent effective control measures, a high ground-water problem in the District generally, the Bureau could not anticipate or foretell exactly where the groundwater level would rise to a point which would affect adversely any particular property owner’s agricultural operation. In foreseeing the problem, the Bureau was doing so as part of a general one in the District and could not separate the ground-water problem by property boundaries. The Bureau knew that because of the general character of the soil materials in the District and the general structure of the area, ground-water problems might be anticipated unless adequate controls were undertaken and that, absent such controls, the problem would become increasingly severe. However, the direction of flow of underground water can be predicted only in a general way. A specific situation in a localized area is affected by innumerable factors, such as soil conditions, including bedrock, layers of clay, and *256 hardpan formations, which may take the form of streaks or lenses. Hydrostatic pressures built up by waters trapped in underground basins may also affect water movement. Pervious soils naturally permit more water movement. The existence of underground aquifers may also control the movement. This makes the exact direction of movement of underground water, or its specific path, unpredictable. When a body of water is perched on a hillside, which would be the general relationship of the Canal at the unlined portion to plaintiff’s orchard, it is not possible to foretell or pinpoint exactly where the seepage will go or how it will react.
23. As above noted, the Canal is lined with concrete where it abuts plaintiff’s orchard on the south. However, it is not so lined from a point approximately 100 feet east of the orchard for a distance of about 4 miles east and north upstream therefrom. Between this unlined portion of the Canal and the orchard lies the 60-acre Binns property. Extending from the eastern portion of the orchard through the Binns property and to and through the Canal where it is unlined, there is an area of soil which the Bureau defined and described as “Young Alluvium — active fans and flood plains. Loose, porous and unconsolidated sediments. Sands and gravel predominate.” Between station 3340+00 and 3348+00, a distance of 800 feet unlined with concrete, the Canal is partially lined with compacted earth or clay, as set forth in findings 7 and 14, and partially unlined. Between station 3350+00 and 3366+00, a distance of 1,600 feet, the Canal has a compacted earth-lining. The partially compacted earth-lined and partially unlined portion of the Canal of 800 feet traverses and crosses the young alluvium soil formation. The soil is a very good conductor of water, as its permeability is high, as set forth in the Bureau’s “Technical Studies” report referred to in finding 15.
24. Much of the soil in plaintiff’s orchard and in the District has been described by the Bureau as “Old Alluvium— poorly sorted arkosic sands, silts and clays usually somewhat oxidized, often consolidated or partially indurated. Soils have moderate to well developed hardpan.” The hardpan under plaintiff’s orchard is undulating, composed of small *257 lenses or layers that thin out, and contain many cracks. The soil in the orchard and in much of the district tends to swell when wet, and when dry, it develops deep cracks.
25. Available well logs for the period 1934-1951 show the ground-water level in plaintiff’s orchard as ranging from 21 to 74 feet below the surface, with most readings in excess of 50 feet. In 1948 the water table at the northeast corner of the orchard was 50 feet higher than it was 2y2 miles further west. In the spring of 1957, this difference had increased to 77 feet. In 1948, the average rate of fall was 20 feet per mile. In the first half mile going west along the north line of the orchard from its northeast corner, the fall was at the rate of 16 feet per mile. In the spring of 1957, the average rate of fall for the 2y2 miles in question was 30 feet per mile. In the first half mile going west along the north line of the orchard from its northeast corner, the fall was at the rate of 30 feet per mile. The rise in the water table in the northern portion of the orchard, from 1948 to 1957, was about 42 feet as contrasted to a 15-foot rise 2y2 miles west. Thus, there could be no backup of water from the west under these conditions during those years.
26. As noted, the 1956 study by the Bureau showed that there had been an average rise in the water table of approximately 5 feet per year from 1950 to 1955 in the 1,800-acre area in the District adjacent to the portion of the Canal unlined with concrete. Plaintiff’s property lies within this area. Since 1955, there have been additional rises in the District, including plaintiff’s orchard.
27. After the initial discovery in the fall of 1955 that the water level near plaintiff’s farmstead was within 18 inches of the ground surface, detailed studies were made, as set forth above. In June 1956, water was found at a depth of 1.4 feet (about 17 inches) in the northern end of the grove. The land was boggy in this area. Gradual variations occurred from that area to the extreme southeastern portion of the orchard where the depth to ground water was 16 feet. Substantially one-half of the orange grove in June 1956 had a depth to ground water of approximately 2 feet. Many of the dead trees and the worst of the damaged trees are in this area. Substantially three-fourths of the orange *258 grove bad a depth to ground water of 3 feet or less. All of the orange grove had a depth to ground water of 5 feet or less. The depth to ground water in the lemon grove varied from 16 feet in a small area at the southeastern portion, and 13 feet at the southwestern portion, to 5 feet at the northern part of the grove where it adjoins the southern part of the orange grove, and where the depth is also 5 feet. Approximately two-thirds of the lemon grove had water within 5 to 10 feet of the surface of the ground. Thus, the depth in the entire orchard varied from 16 feet at the southeastern end of the lemon grove, to approximately 2 feet in the northern part of the orange grove.
28. When the Canal was put into operation in 1950, plaintiff used some canal water in its orchard to supplement its local well supply. As soon as the high ground-water problem appeared in the fall of 1955, it ceased the use of canal water and relied on pumps in an attempt to draw down the water table. In 1957, it installed a drainage system on the west side of the orange grove, upon the recommendation of its engineer and other expert advisers, at a cost of about $8,500. The system was installed in an effort to see what could be done to ameliorate the excessive ground-water condition. This system consists of an intercepting pipe drain,
8 feet deep, with the drainpipes running north and south near the center of the orange grove and with two lateral lines to the west. These lines collect seepage water and convey it to sumps, where pressure pumps force it back into the Canal. This was done with the permission of the Bureau. As the digging equipment dug the trench for the pipes, the saturated condition of the soil below the ground surface could be readily observed. In some places water spurted from the bottom and sides of the trench in the wake of the digging machine. Within a short time after the drain trench was dug, free water gradually rose in it to various levels. As mentioned, this area has irregular hardpan lenses of compacted soil, at times several inches thick and at varying depths below the ground surface. Seepage water from the Canal tends in various places to become trapped in the orchard to the extent that it is under these lenses. Because the Canal is at a higher elevation; the pressure forces the *259 seepage water into the root zone of the trees wherever breaks or cracks in the lenses occur and wherever the lenses thin out. This drainage system resulted in some localized improvement, but it is not a solution to the overall problem and it has not resulted in the salvaging of any substantial part of the orange grove.
29. Between June 1957 and June 1958, with the orange grove drain in operation, over two-thirds of the orchard continued to have a rising water table. A grid of deeper drains has been considered as a possible solution but such a grid is of doubtful value, especially when compared to the expense involved. In addition to funds already expended, such a system would involve a further capital cost of approximately $42,000, an annual operational and maintenance cost of approximately $2,200, and revisions in the pipelines costing approximately $3,100. It would not recoup the damage which has already occurred, there is no reasonable certainty it would solve the problem, and it would contribute greatly to the overall cost of plaintiff’s operations.
30. The earth section of the Canal is 64 feet across the bottom. The banks slope up from each side approximately 30 feet and 27.48 feet of the side slopes are covered with water when the Canal is carrying a maximum depth of 18.32 feet. This produces a wetted perimeter of 118.96 feet. When full, a hydrostatic pressure at the Canal bottom is created equal to 7.9 pounds per square inch or 1,140 pounds per square foot. The pressure along the side slopes gradually lessens from the bottom to the top. The water level of the Canal when full is 11 feet above the ground surface at the highest point in plaintiff’s orchard (the southeast corner) and 31 feet above its lowest point (the northwest comer). The combination of these factors results in a perched body of water in the Canal above plaintiff’s orchard, the great weight of which continuously forces seepage water into the Stone Corral Orchard.
A portion of this seepage may be characterized as partially confined water to the extent that it becomes trapped and pressurized under the discontinuous hardpan lenses. Other portions of the seepage may be characterized as unconfined or free water to the extent that it seeps through the Canal *260 banks above the hardpan layer and also to the extent that the partially confined waters migrate toward the ground surface through the breaks, fissures, and around the edges of the variable hardpan lenses.
31. Observations of test holes and wells in various locations near the Canal and elsewhere show that the underground water table is highest in elevations near the Canal. As the water moves away from the Canal, toward and through plaintiff’s orchard, the sloping gradient of the water table tends to flatten out slightly. The steepening levels of.the water table near the Canal shows that considerable seepage is occurring. The direction of flow is from the east at the Canal to the west and northwest through plaintiff’s orchard.
32. Although there are some variations, the water table in plaintiff’s orchard is generally responsive to the amount and depth of the water flowing in the Canal. The Canal is normally emptied and kept empty during December and January of each year for maintenance and repair purposes. When the Canal was emptied in late 1957, the observation holes in the orchard showed a significant drop in the water table. When the Canal was filled in February 1958, there was an immediate rise in the water table under plaintiff’s orchard. There is a general correlation between canal-water levels and ground-water levels at a considerable distance west of the Canal.
33. The high water table in plaintiff’s orchard is primarily caused by canal seepage. There is some contribution to the underground water table from rainfall and runoff from the foothills. There may also be some contribution from natural springs from Mud Springs Gap, which is located immediately east of the south end of the orchard on the opposite side of the Canal. However, in their effect upon plaintiff’s problem, these contributions are negligible. Such sources in recent years have not provided even a desirable amount of underground water replenishment. The runoff from the foothills is very slight. The average rainfall in the area has been less than 10 inches per year. Although there were abnormal amounts of rainfall in the area during the winter of 1955, the spring of 1956, and the winter-spring season of 1958, which may have aggravated an already serious sitúa *261 tion, in the 3 years prior to September 1955, when the high ground-water condition in plaintiff’s orange grove first appeared, the rainfall was less than average. The surface slope on plaintiff’s orchard is as much as 20 feet in less than one-half mile, thus producing excellent surface drainage. Mud Springs Gap caused no problem prior to the Canal. Absent the seepage from the Canal situation, the rainfall and runoff factors would have had no appreciable damaging effect on plaintiff’s operations.
34. There was no significant excessive use of irrigation water in any of the areas adjoining plaintiff’s orchard. Thus there was no addition to ground water from such sources. Both the Binns property to the east and the Whitfield-Uota parcel to the west used less irrigation water during the period in question than the field crops grown upon them required. The fact that they produced crops indicated that subirrigation from canal seepage was present on those properties, and test holes so indicated. Plaintiff’s orchard also used less irrigation water than is normally required for citrus culture and none of it contributed to the ground-water level. While the water table to the north of the orchard has also reached close to ground surface, it has not contributed to plaintiff’s problem. That water table is lower in elevation than that on plaintiff’s property. The flow of the canal seepage water is through plaintiff’s orchard toward the other properties in the area to the north and west.
35. After the death of the first orange trees in the fall of 1955, the area and extent of blight has continued to spread and further manifest itself in the orange grove. In the northern section of the . orchard, numerous additional trees have died or partially died. Trees have died elsewhere in the west half of the orange grove. A substantial number of trees in two-thirds to three-fourths of the orange grove shows serious damage in the nature of dieback of leaves and branches, discoloration and yellowing of leaves, and thinning out of foliage and fruit. While this manifests itself to a varying extent in different areas, it is so serious as to leave approximately two-thirds of the orange grove in a partially dead or deteriorating condition. Only 10 to 14 *262 acres of oranges in the southeast portion of the orange grove still have the visual appearance of being relatively unaffected by the excessive ground water. However, the continued well-being of even these trees must be considered to be in serious jeopardy by reason of the presence of water in the immediate vicinity of their roots.
36. The progressive damage in the orange grove caused by the excessive ground water has resulted in a change hi fruit maturity to a later and less favorable period. The harvesting of oranges commences in the fall, around mid-November, and continues into the spring of the following year. Total production has drastically declined from a high of about 20,000 field boxes of oranges in the 1954-1955 season, to about 6,400 boxes in the 1957-1958 season. In the latter season, the production in the west half of the orange grove was only 600 boxes. This is about 30 boxes to the acre as compared to the normal average production of more than 300 boxes to the acre. Thus approximately two-thirds of the orange grove is virtually nonproducing. The total income loss to plaintiff has as a result been considerable.
37. The high ground-water table causes its damage in part by rotting the lifegiving roots of the trees. Water in the root zone for prolonged periods asphyxiates the roots. It also provides the environment for a destructive fungus which lives and thrives only in excessive moisture and consumes the organic root structure. It cannot be now ascertained how much damage may have already been done to the roots of trees which still appear healthy. Absent corrective measures, there is no reasonable prospect of bringing the damaged areas back into production on any economic basis. Experienced orangegrowers consider that the present orange grove is doomed.
38. The effects on plaintiff’s operational problems in the orange grove have been troublesome and expensive. Machine equipment has bogged down, thus interfering with necessary cultivation and other agricultural activities. Irrigation problems have been most difficult. The topsoil near the surface has at times become so dry as to require moisture to feed the roots there, while a coring of the soil indicated the lower root zone to be so saturated as to make irrigation dan- *263 gerotis. The irrigation system in the orchard is designed to irrigate large blocks in one operation, but variations in soil moisture due to canal seepage have required irrigation in smaller irregular blocks, while leaving adjacent irregular areas free of surface irrigation. This has resulted in tree-by-fcree farming practices of a much more costly and laborious nature than are normally required.
39. The water seeping from the Canal into plaintiff’s orchard had, by September 30, 1955, become, and continues to be, so great as to saturate and inundate the soil in the root zone of a large part of plaintiff’s orange grove. This root zone includes not only the upper 3 to 5 feet of the soil where the majority of the thickly matted feeder roots of orange trees are nourished, but in plaintiff’s orange grove it also includes what may be termed the “agricultural zone” of approximately 10 feet. Down into these depths grow the taproots, which the high water table rots and kills. Such roots tend to be relatively deep in this orchard by reason of the dryness of the subsurface during the earlier years of the trees’ growth. This has rendered the orange orchard unfit for economic production. Even though some trees may survive or be salvaged, there is no prospect of farming it successfully as a commercial orange orchard under present conditions.
An orange orchard originally planted in an area where ground water did not rise above approximately 5 feet, without taproots extending deeper, and with the shallow feeder roots supporting the life of the trees, could survive, although experienced orangegrowers would not consider this as a satisfactory situation since airy slight rise in the water level due to any cause or factor would endanger the grove. Nevertheless, the ground-water level of most of the orange grove after the fall of 1955 was higher than 5 feet. In the lemon grove, however, the ground-water level has not risen above 5 feet.
Tests made in 1958 show that there has been a further rise in the ground-water level in large portions of plaintiff’s orchard. This rise has equaled 2 feet in certain areas. The southern end of the lemon grove, which principally had a depth of 14 feet in 1956, has risen to approximately 12 feet. *264 The northern end of the lemon grove, however, remained substantially at the 5-foot level it had been in 1956. A slight improvement was noted in some small areas.
40. An orange orchard grows indefinitely, but very slowly after maturity. By 1950, plaintiff’s orange grove was a mature orchard. But for the canal seepage problem, there is nothing to indicate that the grove would not have continued in the indefinite future as a successful commercial operation. Were the seepage problem to be solved, which is possible if sufficient money was spent in the establishment of an effective drainage system or systems, either in the form of a deep toe drain along the unlined portion of the Canal, or by lining the unlined portion with concrete, or by the installation of some other drainage system on the orchard itself, the orange grove would then, for the most part, have to be replanted. It would then take approximately 17 years to bring the grove back to the same state of maturity it was in when the high ground-water condition first manifested itself in 1955. Were the condition to be corrected, and were the orange grove to be replanted, a more valuable grove would ultimately result, since modem double row orange grove plantings are superior to and result in more valuable orange groves than the former type of single row plantings such as is on plaintiff’s orange grove. However, a correction of the seepage problem, pulling and disposing of the present trees, and replanting and maintaining the new grove until it reaches the producing stage, a period of some 6 years, would require a very substantial capital investment.
41. Plaintiff also contends that the lemon grove has been similarly adversely affected by canal seepage. While the evidence is clear and satisfactory that canal seepage has caused crippling damage to the orange grove and under present conditions has rendered its further commercial operation infeasible, the direction of the seepage flow being established as east-west from the unlined portion of the Canal east of the orchard generally to the northeast corner of the orange grove, where the orange trees show the greatest damage, the evidence is not sufficiently clear to establish at the present time a similar serious damaging underground water condition in the lemon grove which has manifested itself in the form of damage to the lemon trees.
*265 As noted, the pitch or slope of the orchard is such that water coming in from the east will generally flow west and north. Water coming in from the south (the lemon grove being in the southern half of the orchard) will generally flow north and west. Thus, the contours are such as to throw the water from the lemon grove into the direction of the orange grove.
While plaintiff’s lemon grove since 1955 has presented problems of a cultural nature, these problems are not associated with high water tables. The lemon grove has not been considered as being an entirely satisfactory one. There have always been spotty areas of dead trees in the grove, even before 1955 and dating back to the pre-canal period. At present, there are approximately 5 acres of dead trees in the lemon grove, but this situation is no worse than it was prior to 1955.
Although the underground water table in the lemon grove has also risen drastically, it has not risen as high as in the orange grove. As shown, as of June 1956, all of the orange grove had a ground-water table of 5 feet or less, with a substantial portion being 2 to 3 feet. However, as of 1958, the water level in the greater part of the lemon grove was approximately 8 to 13 feet. Only one small part of the grove shows a water table of 5 feet. The entire range in the grove is from 5 to 14 feet. These levels have not as yet affected any trees. Generally, a lemon tree is more vigorous, and more resistant to an adverse moisture condition, than is an orange tree.
Test well borings made in 1956 near the unlined portion of the Canal opposite the lemon grove show that generally the direction of underground seepage flow in this area follows the Canal and runs parallel with it, instead of west toward the lemon grove. In addition, on this part of the Canal, as well as in the lemon grove itself, the soil differs in that it is a tight clay of a heavy adobe type which does not permit the rapid transmission of water.
42. The 35 acres comprising the orange grove has, as a result of the high ground-water condition, been reduced in value to that of bare land, capable of being used for row crops and not for citrus culture. As such bare land, the *266 grove had, as of the fall of 1955, when the high groundwater condition first became evident, a fair market value of $650 per acre, or a total value for the 85 acres of $22,750, constituting a reduction of $99,750 from its value as set forth in finding 8. The residual value of the entire orchard after September 1955 was $94,150, calculated as follows:
Orange grove_35 acres @ $650 per acre=$22, 750
Lemon grove_31 acres @ 2,200 per aere= 68,200
Alkali_ 2 acres @ 100 per acre= 200
Buildings and roads_ 3 acres @ 1, 000 per acre= 3, 000
71 acres 94,150
This value has continued without substantial change to the present.
CONCLUSION OK LAW
Under the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover for the taking by the defendant of an easement of seepage at a depth of two to three feet under and through the northern thirty-five (85) acres of plaintiffs’ property, and judgment is entered to that effect. The amount of just compensation to be paid for the taking will be determined in further proceedings before the Trial Commissioner.
It is further concluded that the defendant is not entitled to recover on its contingent claim against the third party defendant and that claim is dismissed.

 The seepage has not Impaired the value or usefulness of these five acres and plaintiffs do not claim compensation therefor, under the easement theory which we have adopted.